IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - LAW DIVISION

| | | |
|---|---|---|
| RITCHIE SPECIAL CREDIT INVESTMENTS, LTD., RHONE HOLDINGS II. LTD., YORKVILLE INVESTMENT I, L.L.C., RITCHIE CAPITAL STRUCTURE ARBITRAGE TRADING, LTD., RITCHIE CAPITAL MANAGEMENT, L.L.C., | ) ) ) ) ) ) ) | 2008L051021 CALENDAR/ROOM 1 TIME 00:00 Extraordinary Remedy Judge _____ Case No. _____ |
| Plaintiffs, | ) ) | **Jury Demand** |
| v. | ) ) ) | |
| THOMAS J. PETTERS, PETTERS GROUP WORLDWIDE, LLC, PETTERS COMPANY, INC., | ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

1.      Ritchie Special Credit Investments, Ltd., Rhone Holdings II. Ltd., Yorkville

Investment I, L.L.C. and Ritchie Capital Structure Arbitrage Trading, Ltd., (together, the

"Ritchie Lenders") and Ritchie Capital Management, L.L.C. ("RCM," and together with the

Ritchie Lenders, "Plaintiffs"), are parties to a Note Purchase Agreement dated February 19, 2008

(as amended by the Extension Agreement referred to below, the "Note Purchase Agreement," a

copy of which is attached hereto as Exhibit A) and an Extension and Amendment Agreement

dated September 19, 2008 ("Extension Agreement," a copy of which is attached hereto as

Exhibit B). The Ritchie Lenders purchased promissory notes in February 2008 pursuant to the

Note Purchase Agreement ("Notes") and in May 2008, which Notes are attached hereto as

Exhibit C. Pursuant to the Notes, defendants Thomas J. Petters, Petters Group Worldwide, LLC

("PGW") and Petters Company, Inc. ("PCI") (together "Borrowers" or "Defendants") borrowed

from the Ritchie Lenders amounts that, as of today, have an aggregate value in outstanding



principal and accrued interest of approximately $223,000,000 that has not been paid. RCM acts as administrative agent for all of the Ritchie Lenders under the Note Purchase Agreement and the Notes.

2.    Defendants have defaulted on the terms of the Notes and the Note Purchase Agreement by making materially incorrect representations in the Note Purchase Agreement and the Extension Agreement. Among other things, Defendants represented that: (a) no governmental investigation of Defendants exists; and (b) the financial statements of the Defendants "fairly present in all material respects the financial position of the company or companies subject thereto." In fact, however, the Federal Bureau of Investigation ("FBI"), Internal Revenue Service ("IRS") and other federal agencies have been conducting a fraud investigation into PCI, Petters and related entities for some time. Accordingly, the representation that there is no governmental investigation is materially incorrect. Additionally, the federal authorities have evidence that Defendants fraudulently indicated that certain items of inventory were assets of the Defendants, when in fact such inventory items did not exist. Consequently, the financial statements supplied by Defendants included assets that did not exist, and thus those statements did not "fairly present in all material respects the financial position" of Defendants.

3.    Defendants' materially incorrect representations constitute "Events of Default" under the loan agreements. Plaintiffs have served upon Defendants a notice of default, which renders all outstanding loan amounts under the Notes immediately due and owing.

4.    Defendants also defrauded Plaintiffs. As detailed in an affidavit submitted by an agent of the FBI in order to secure a search warrant for the PCI's headquarters and Petters's personal residence, Petters fraudulently obtained from investors, through Defendant PCI, substantial sums that he "used . . . for his other business ventures and to support his extravagant

2

lifestyle." (Affidavit of Timothy Bisswurm, Special Agent, Federal Bureau of Investigation (Sept. 19, 2008) ("FBI Affidavit," attached hereto as Exhibit D). The FBI Affidavit states that, among other things, Petters and entities owned or controlled by him have been perpetrating the fraudulent scheme since the mid-1990s, and that Petters ordered the creation of false documents. Accordingly, Defendants fraudulently induced Plaintiffs into signing the Note Purchase Agreement and the Extension Agreement and into purchasing Notes from Defendants.

## PARTIES

5.     Ritchie Special Credit Investments, Ltd. ("Special Credit") is a Cayman Islands company and its principal place of business is in the Cayman Islands. Special Credit is a party to the Note Purchase Agreement and the Extension Agreement, and owns Notes with principal and accrued interest valued at approximately \$120,400,000.

6.     Rhone Holdings II. Ltd. ("Rhone") is a Cayman Islands company and its principal place of business is in the Cayman Islands. Rhone is a party to the Note Purchase Agreement and the Extension Agreement, and owns Notes with principal and accrued interest valued at approximately \$55,300,000.

7.     Yorkville Investment I, L.L.C. ("Yorkville") is a Delaware limited liability company and its principal place of business is in the State of Illinois. Yorkville is a party to the Note Purchase Agreement and the Extension Agreement, and owns Notes with principal and accrued interest valued at approximately \$34,900,000.

8.     Ritchie Capital Structure Arbitrage Trading, Ltd. ("Capital Structure") is a Cayman Islands company and its principal place of business is in the Cayman Islands. Capital Structure is a party to the Note Purchase Agreement and the Extension Agreement, and owns Notes with principal and accrued interest valued at approximately \$12,400,000.

3

9. Ritchie Capital Management, L.L.C. ("RCM") is a Delaware limited liability company and its principal of business is in Lisle, Illinois. RCM is a party to the Note Purchase Agreement and the Extension Agreement. RCM serves as administrative agent for all of the Ritchie Lenders that purchased Notes. In that capacity, RCM has certain authority to act on behalf of the Ritchie Lenders with respect to the Notes.

10. Thomas J. Petters is a citizen of Minnesota currently residing in Wayzata, Minnesota. Petters is a party to the Notes, the Note Purchase Agreement and the Extension Agreement. Petters, through various entities including the other Defendants, has substantial ownership interests in numerous businesses, including Polaroid Corporation, Sun Country Airlines and magazine publisher Great Waters Media.

11. Petters Group Worldwide, LLC ("PGW") is a Delaware limited liability company and its principal place of business is in Minnetonka, Minnesota. PGW is a party to certain of the Notes, the Note Purchase Agreement and the Extension Agreement.

12. Petters Company, Inc. ("PCI") is a Minnesota corporation and its principal place of business is in Minnetonka, Minnesota. PCI is a party to certain of the Notes, the Extension Agreement and, by virtue of Section 3(a)(iii) of the Extension Agreement, to the Note Purchase Agreement.

## JURISDICTION

13. This Court has personal jurisdiction over the Defendants pursuant to 735 ILCS 5/2-209 because, among other things, the Defendants transacted business within, and made contractual promises substantially connected to, Illinois in connection with negotiating and entering into the Note Purchase Agreement, the Extension Agreement and the Notes, and because they consented to such jurisdiction in Section 11 of the Extension Agreement.

4

## VENUE

14.     Venue is proper in this county pursuant to 735 ILCS 5/2-101 because Defendants

are nonresidents of the State of Illinois, and therefore venue is proper in any county in the State

of Illinois.

## FACTS

### The Loan Agreements, Purchase Of The Notes And Related Fraud

15.     In February and May of 2008, the Ritchie Lenders purchased Notes from

Defendants under the Note Purchase Agreement and otherwise. In August 2008, as the due date

for payment under certain of the Notes approached, Plaintiffs and Defendants began negotiations

to extend the due date for payment, which ultimately resulted in execution of the Extension

Agreement. The Extension Agreement effected various amendments to the Notes and the Note

Purchase Agreement, including extending the due date for payment under the Notes until

December 2008.

16.     The Extension Agreement contained certain representations and warranties.

Section 7 of the Extension Agreement, titled "Representations and Warranties of the Borrowers,"

provides in pertinent part:

> To induce the Collateral Agent and Note Purchasers to execute and
> deliver this Agreement and consummate the transactions
> contemplated hereby, each Borrower represents and warrants that:
>
> . . .
>
> (e) Except as set forth on Schedule 7(e) hereto, as of the date
> hereof, there is no material claim, legal action, counterclaim, suit,
> arbitration, governmental investigation, litigation, or any other
> legal, or administrative proceeding before any governmental
> authority, nor any order, decree or judgment, pending, or to the
> Borrowers' knowledge, threatened, against or relating to any of the
> Borrowers or any Affiliate thereof.

5

17.     Section 3.4 of the Note Purchase Agreement contains a representation by the

Defendants that the "financial statements delivered by the Borrowers to such Purchaser in

connection with the execution and delivery of this Agreement by such Purchaser fairly represent

in all material respects the financial position of the company or companies subject thereto."

18.     On or about September 24, 2008 – approximately five days after execution of the

Extension Agreement – agents from the FBI, the IRS and other federal agencies, along with local

law enforcement authorities, executed search warrants on the premises of the headquarters of

PCI, as well as the personal residence of Thomas J. Petters.

19.     According to a news report, FBI spokesman Paul McCabe stated that the search

warrant execution was part of an ongoing federal investigation. (*See* Article, "Federal agents

raid Petters' Minnetonka HQ," attached hereto as Exhibit E.)

20.     The FBI Affidavit (Exhibit D hereto) detailed the information gathered in that

ongoing investigation as of September 19, 2008. The following are among the information set

forth in the FBI Affidavit:

> a.      "PCI is the venture capital arm of numerous PETTERS enterprises. The
> money raised by PETTERS through PCI is used by PETTERS for his
> other business ventures and to support his extravagant lifestyle." (FBI
> Affidavit, ¶ 7(a) (statement of confidential witness ("CW")).)
>
> b.      "The fraudulent scheme was perpetrated by PETTERS, DEANNA
> COLEMAN (PCI Vice President of Operations); ROBERT WHITE
> (former PCI officer and current consultant to PCI) . . . and other persons.
> The scheme began in the mid 1990's." (*Id.* ¶ 7(b) (statement of CW).)
>
> c.      "PETTERS has solicited investors to invest substantial sums in PCI. To
> induce investors to invest, the investors were advised funds would be
> secured by transactions (which were fictitious). Investors were then
> provided with false documents relating to the purchase and resale of
> merchandise. The fraudulent documents purport to evidence PCI
> purchasing merchandise from vendors . . . . Additional purchase orders
> falsely detail PCI's sale of the same merchandise to [retail] stores . . . ."
> (*Id.* ¶ 7(c) (statement of CW).)

6

d.   "The purchase orders and other documents in support of the transactions are entirely fabricated. PCI does not buy any merchandise from [the vendors]. Nor does PCI sell merchandise as described in the purchase orders [to retailers]. PETTERS uses these documents to induce investors to invest money." (*Id.* ¶ 7(d) (statement of CW).)

e.   "The CW provided documents corroborating the allegations, including an itemized list of investors who are owed money by PCI, copies of numerous Promissory Notes, and copies of other lending documents that pertain to the scheme." (*Id.* ¶ 8.)

21.   The FBI Affidavit also sets forth information gathered from recordings of conversations among the participants in the scheme. "In September 2008, the government obtained consensually monitored conversations involving PETTERS, DEANNA COLEMAN [PCI Vice President of Operations], ROBERT WHITE [former PCI officer and current consultant to PCI] . . . and other persons." (FBI Affidavit ¶ 12.) As set forth below, those conversations revealed, among other things, that PETTERS was fully aware of, and was conducting, the fraud, and indicated an intent to flee the country if the fraud were revealed:

a.   "In these recordings, PETTERS repeatedly admits executing the fraud scheme by providing fraudulent information to investors. PETTERS repeatedly discusses the stressed financial condition of the company, as well as the need to find more capital. . . . PETTERS continues to ask [COLEMAN] to prepare false documents, noting that he doesn't know what choice they have. PETTERS talks about fleeing the country and creating fabricated defenses if the fraud scheme is discovered." (*Id.* ¶ 12 (a).)

b.   "PETTERS states that [one participant in the scheme] told PETTERS that they are 'a little paper manufacturing plant.'" On one occasion, PETTERS states that he and [that same participant] would be jointly implicated in a scheme to defraud investors out of $130 million." (*Id.* ¶ 12 (b).)

c.   Another participant "describes the fraud scheme as a 'Ponzi scheme,' and estimates that at least $100 million of PCI's debt is fraudulent." (*Id.* ¶ 12 (c).)

d.   A participant "asks that COLEMAN prepare purchase orders to be submitted to investors so that the investors will extent the due dates on debt." (*Id.* ¶ 12(d).)

7

      e.     A participant "admits that PETTERS told him about the fake purchase orders, and that [the participant] has known about this for many years. [The participant] estimates the amount of fraud as in excess of $2 billion." (*Id.* ¶ 12(f).)

22.     Based upon the foregoing, Defendants fraudulently induced Plaintiffs to enter into the Note Purchase Agreement in February 2008 and to purchase Notes in February 2008 under the Note Purchase Agreement, and to purchase additional Notes in May 2008, by, among other things, falsely representing that Defendant PCI had a successful, viable business in purchasing merchandise from certain parties and reselling it to major retailers. Absent such fraudulent representations, Plaintiffs would not have signed the Note Purchase Agreement and the Ritchie Lenders would not have purchased the Notes in February 2008 or May 2008.

23.     Upon information and belief, the funds secured by Defendants from Plaintiffs under the Notes and the Note Purchase Agreement were the last significant amount of funds that Defendants were able to secure. Accordingly, Plaintiffs are the "last in" to what the participants in the fraud called a "Ponzi scheme", meaning that their funds likely were used to pay prior creditors in hopes of perpetuating the scheme. Defendants fraudulently omitted this information when inducing Plaintiffs to sign the Note Purchase Agreement and the Ritchie Lenders to purchase Notes – actions that would not have been taken absent the fraudulent omissions.

24.     Defendants also fraudulently induced Plaintiffs to enter into the Extension Agreement, which extended the due date for the amounts due under the Notes from August 31, 2008 to December 19, 2008. Defendants again falsely represented that PCI had a viable, successful business in purchasing merchandise from certain parties and reselling it to major retailers. Defendants also again fraudulently omitted to tell Plaintiffs that PCI was involved in a "Ponzi scheme" that used funds obtained from new investors to pay off prior creditors. Nor did

8

Defendants correct prior such false statements and omissions. Absent such fraudulent

representations and omissions, Plaintiffs would not have entered into the Extension Agreement.

### Default Under The Agreements

25.    Section 6.1 of the Note Purchase Agreement, titled "Events of Default," as

amended by the Extension Agreement, provides in pertinent part:

> Each of the following events, acts, occurrences or conditions shall
> constitute an "Event of Default" under the Loan Documents,
> subject to Section 6.2(a):
>
> (f) Any representation or warranty made by the Borrowers under
> the Extension and Amendment Agreement, dated as of September
> 19, 2008, by an among the Borrowers and the Collateral Agent, is
> breached or proves to have been incorrect in any material way
> when made, or if had been made on any later date by reference to
> the circumstances then existing, would have been incorrect in any
> material respect on that later date.

26.    The representation in Section 7(e) of the Extension Agreement regarding the

existence of a "governmental investigation" is materially incorrect. The FBI Affidavit indicates

that the investigation was active on September 8, 2008, and began prior thereto. Accordingly,

the representation in Section 7(e) that no "governmental investigation" existed was materially

incorrect when made on September 19, 2008. Furthermore, the representation in Section 7(e)

regarding a "governmental investigation," if it had been made on September 24, 2008 (the date

on which the FBI executed its search warrants) by reference to the circumstances existing on

such date, would have been incorrect in a material respect on September 24, 2008. Such

incorrect representations constitute an "Event of Default" under the Note Purchase Agreement.

27.    The Defendants' representation regarding the accuracy of the financial

statements they delivered to Plaintiffs was also materially incorrect. The FBI Affidavit states

that the use of fictitious collateral to obtain funds from investors began in the mid 1990s. This

indicates that the financial statements of PCI would inaccurately reflect the level of assets and

9

debt during that time. The FBI Affidavit states that the accounts receivable reflected on the June 2008 balance sheet of PCI "are based on the false documents" and therefore the "actual accounts receivable are substantially less than that listed on the balance sheet." (FBI Affidavit ¶ 8 (a).) Prior financial statements stretching back to the mid 1990s would likewise reflect overstated levels of accounts receivable.

28.     Section 6.2 of the Note Purchase Agreement, titled "Remedies," as amended by the Extension Agreement, provides in pertinent part:

> (a) If any Event of Default has occurred and is continuing, any holder or holders of more than 80% in aggregate principal amount of the Notes at the time outstanding (the "Required Holders") may at any time at its or their option, declare all the Notes then outstanding to be immediately due and payable.

29.     On September 26, 2008, the Ritchie Lenders, which are holders of more than 80% of the aggregate principal amount of the Notes, provided Defendants with a notice of default pursuant to Section 6.2(a) of the Note Purchase Agreement. Such notice is attached hereto as Exhibit F.

30.     Pursuant to Section 6.2(a) and the notice of default, all of the outstanding principal and accrued interest under the Notes are now due and payable from the Defendants to the Ritchie Lenders. The total amount due and owing the Ritchie Lenders is approximately $223,000,000. Defendants have not paid any of the amounts due and owing under the Notes.

## COUNT I

### Breach of Contract

31.     Plaintiffs incorporate the preceding paragraphs of the Complaint as it set forth fully herein.

32.     Plaintiffs and Defendants are parties to the Note Purchase Agreement and the Extension Agreement.

10

33.    The Defendants' representation in Section 7(e) of the Extension Agreement that no "governmental investigation" existed was materially incorrect when made on September 19, 2008 because the FBI Affidavit states that the investigation was active as of September 8, 2008. Additionally, that representation was materially incorrect on September 24, 2008 by reference to the circumstances then existing (*i.e.*, the execution of the search warrant by federal and local authorities on September 24, 2008).

34.    Defendants' representation in Section 3.4 of the Note Purchase Agreement that the financial statements submitted by Defendants were accurate was materially incorrect because the actual accounts receivable of Defendants "are substantially less" than those reflected on the financial statements (FBI Affidavit ¶ 8(a)).

35.    Section 6.1(f) of the Extension Agreement provides that an "Event of Default" occurs if, among other things, any "representation or warranty made by the Borrowers" under the Extension Agreement "proves to have been incorrect in any material way when made, or if it had been made on any later date by reference to the circumstances then existing, would have been incorrect in any material respect on that later date." Accordingly, an Event of Default has occurred because the representation regarding the existence of a governmental investigation was materially incorrect.

36.    The Ritchie Lenders, which are holders of the requisite 80% of the principal of the outstanding Notes, provided Defendants with a notice of default pursuant to Section 6.2(a) of the Note Purchase Agreement on September 26, 2008. Pursuant to that notice, all principal and accrued interest under the outstanding Notes is immediately due and payable.

37.     The principal and accrued interest under the outstanding Notes owned by the Ritchie Lenders is approximately $223,000,000. Defendants have not paid to the Ritchie Lenders any of the amounts due and owing under the Notes.

## COUNT II

### Fraud in the Inducement

38.     Plaintiffs incorporate the preceding paragraphs of the Complaint as it set forth fully herein.

39.     Defendants made fraudulent representations and omissions regarding the nature and viability of Defendant PCI's business and the use of the funds to be obtained by virtue of the Notes purchased pursuant to the Note Purchase Agreement.

40.     Absent those fraudulent representations and omissions, Plaintiffs would not have entered into the Note Purchase Agreement, nor would the Ritchie Lenders have purchased Notes thereunder.

41.     Defendants also made fraudulent representations and omissions regarding the nature and viability of Defendant PCI's business and the use of the funds to be obtained by virtue of the Notes in connection with the negotiations leading to the Extension Agreement.

42.     Absent those fraudulent representations and omissions, Plaintiffs would not have entered into the Extension Agreement.

43.     Upon information and belief, in connection with the fraud Defendants have diverted funds supplied by the Ritchie Lenders to other entities controlled by Defendants. Defendants must act to preserve and to maintain those funds for the benefit of the Ritchie Lenders.

44.    Plaintiffs have been damaged by entering into the Note Purchase Agreement and Extension Agreement and, in the case of the Ritchie Lender Plaintiffs, purchasing Notes in reliance upon Defendants' fraud.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter an order awarding Plaintiffs:

1.    Damages equal to all amounts due and owing under the Notes, which is estimated to be approximately $223,000,000;

2.    Preliminary and permanent injunctive relief;

3.    Imposition of a constructive trust;

4.    Interest;

5.    Attorneys fees and court costs;

6.    Punitive damages; and

7.    Such other relief as the Court finds just and reasonable.

Thomas K. Cauley, Jr.
Brian A. McAleenan
Brooke L. Devlin-Brown
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois  60603
phone (312) 853-7000
facsimile (312) 853-7036
Firm I.D. 38315

*Attorneys for Plaintiffs*

13

A

THOMAS J. PETTERS
PETTERS GROUP WORLDWIDE, LLC
4400 BAKER ROAD
MINNETONKA, MINNESOTA 55343

FEBRUARY 19, 2008

RE: NOTE PURCHASE AGREEMENT

TO THE PURCHASERS
LISTED ON SCHEDULE A:

Ladies and Gentlemen:

Thomas J. Petters (*"TJP"*) and Petters Group Worldwide, LLC, a Delaware limited liability company (*"PGW"* and, collectively with TJP, the *"Borrowers"*), hereby jointly and severally agree with the purchasers (the *"Purchasers"*) who become parties to this Note Purchase Agreement (this *"Agreement"*) from time to time as listed in the attached Schedule A as updated from time to time by the Borrowers, and the Purchasers and the Borrowers agree with RITCHIE CAPITAL MANAGEMENT, LLC (the initial *"Administrative Agent"*), as follows:

Section 1.   THE NOTES.

Section 1.1   AUTHORIZATION OF THE NOTES. The Borrowers hereby authorize and re-authorize the issuance and sale of up to $155,000,000 of promissory notes that are subject to the terms of this Agreement (the *"Notes"*). The Borrowers agree that each of the Notes constitutes the joint and several obligation and liability of each Borrower. The form of each Note, and the terms and conditions thereof, shall be as agreed by the Borrowers and each Purchaser, it being acknowledged that the Notes need not have the same terms and conditions, provided, however, that each Note issued pursuant to this Agreement shall rank *pari passu* with each and every other Note issued pursuant to this Agreement. In addition to Notes issued on or after the date hereof, the Notes shall also include, without limitation, the Notes issued prior to the date hereof as indicated on the initial Schedule A attached hereto (the *"Prior Notes"*).

Section 1.2   PURCHASE AND SALE OF NOTES. Subject to the terms and conditions of this Agreement, the Borrowers will issue and sell, or has issued and sold, to each Purchaser and each Purchaser will purchase, or has purchased, from the Borrowers, at the applicable Closing with such Purchaser, a Note in the principal amount specified opposite such Purchaser's name in Schedule A. The obligations of each Purchaser hereunder are several and not joint obligations and no Purchaser shall have any obligation or liability to any Person for the performance or nonperformance by any other Purchaser hereunder.

Section 1.3   USE OF PROCEEDS. The Borrowers may use proceeds from the sale of the Notes for such purposes as such Borrower determines, in its sole discretion.

- 1 -

Section 1.4    CERTAIN ADDITIONAL MATTERS.

(a)    TJP is the registered and beneficial owner of all of the outstanding
membership or other equity interests of PGW. PGW is the registered and beneficial
owner of all of the issued and outstanding shares of capital stock of Polaroid Holding
Company ("PHC"). PHC is the registered and beneficial owner of all of the issued and
outstanding shares of capital stock of Polaroid Corporation ("PC"). TJP's affiliates
include Petters Company, Inc., Petters Company, LLC, Petters Capital, LLC and Thomas
Petters, Inc. (collectively, the "Subordinated Lenders").

(b)    PHC and PC have borrowed funds from the Subordinated Lenders.
Contemporaneous with execution of this Agreement by the Borrowers, the Subordinated
Lenders and the Administrative Agent are executing and delivering that certain
Subordination Agreement of even date herewith (the "Subordination Agreement").

(c)    Until the Notes are paid in full, PGW shall not cause or permit PHC to
pay, and PGW shall not accept payment of, any cash or property dividend or distribution
from PHC to PGW with respect to PGW's ownership interest in PHC (other than
dividends or distributions payable in additional shares of PHC).

(d)    In the event that either Borrower wishes to prepay in whole or in part one
or more Purchaser's Note(s) but not prepay all Notes on a pro rata basis, in an aggregate
prepayment amount determined by the Borrowers, the Borrowers shall provide three
business days advance written notice thereof to all Purchasers and the Administrative
Agent. Each Purchaser, if it so elects by written notice to the Borrowers within two
business days after such notice, may participate in the aggregate prepayment amount
determined by the Borrowers on a pro rata basis based on the relative principal amounts
of the Notes to be so prepaid (it being acknowledged that the Borrowers shall not be
obligated to increase the aggregate amount it is prepaying, just that the Purchasers shall
have the right to participate in any proposed prepayment on such pro rata basis). Notices
under this Section may be given by email.

Section 2.    CLOSINGS.

The sale and purchase of each Note to be purchased by each Purchaser shall occur on
such date or dates as the Borrowers and such Purchaser shall determine, including prior to the
date hereof for the Prior Notes (each such closing, a "Closing"). At the Closing with a
Purchaser, unless otherwise agreed by the Borrowers and such Purchaser, the Borrowers will
deliver to such Purchaser a Note against delivery by such Purchaser to the Borrowers or to its
order of immediately available funds to such account or accounts directed by the Borrowers.

Section 3.    REPRESENTATIONS AND WARRANTIES OF THE BORROWER.

The Borrowers jointly and severally represent and warrant to each Purchaser as of the
date of the Closing with each such Purchaser that:

Section 3.1    ORGANIZATION; POWER AND AUTHORITY.    PGW is a limited liability
company duly organized, validly existing and in good standing under the laws of Delaware, and

- 2 -

is duly qualified as a foreign entity and is in good standing in each jurisdiction in which such qualification is required by law, other than those jurisdictions as to which the failure to be so qualified or in good standing would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the business, operations, affairs, financial condition, assets or properties of PGW taken as a whole ("*Material Adverse Effect*"). PGW has the limited liability company power and authority to own or hold under lease the properties it purports to own or hold under lease, to transact the business it transacts and proposes to transact, to execute and deliver this Agreement, the Notes and the Subordination Agreement (collectively, the "*Loan Documents*") and to perform the provisions of the Loan Documents.

Section 3.2    AUTHORIZATION, BINDING. Each Loan Document to which the Borrowers are or becomes a party as of the date it becomes a party thereto shall have been duly authorized by all necessary limited liability company or other applicable action on the part of each Borrower, and each Loan Document, upon execution and delivery thereof by each Borrower, constitutes or will constitute, a legal, valid and binding obligation of each such Borrower enforceable against such Borrower in accordance with its terms, except as such enforceability may be limited by (i) applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting the enforcement of creditors' rights generally and (ii) general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

Section 3.3    OWNERSHIP OF SHARES. TJP is the registered and beneficial owner of all of the outstanding membership or other equity interests of PGW. PGW is the registered and beneficial owner of all of the issued and outstanding shares of capital stock of PHC. PHC is the registered and beneficial owner of all of the issued and outstanding shares of capital stock of PC. All of such membership interests, equity interests and shares of capital stock have been validly issued, are fully paid and nonassessable, and are subject to no liens or encumbrances.

Section 3.4    FINANCIAL STATEMENTS. The financial statements delivered by the Borrowers to such Purchaser in connection with the execution and delivery of this Agreement by such Purchaser fairly present in all material respects the financial position of the company or companies subject thereto as of the respective dates specified therein.

Section 3.5    COMPLIANCE WITH OTHER AGREEMENTS AND LAWS. The execution, delivery and performance by each Borrower of the Loan Documents to which it is a party will not result in any breach of, or constitute a default under, the organizational documents of such Borrower or under any agreement to which such Borrower is a party or is bound, or conflict with or result in a breach of any law applicable to such Borrower, except, in each case where such breach, default or violation would not reasonably be expected to have a Material Adverse Effect.

Section 3.6    GOVERNMENTAL AUTHORIZATION. No consent, approval or authorization of, or registration, filing or declaration with, any governmental authority is required in connection with the execution, delivery or performance by the Borrowers of the Loan Documents to which they are a party, except for any filings that the Borrowers may elect to make under applicable securities laws.

Section 3.7    TAXES. The Borrowers have filed all income tax returns that are required to have been filed in any jurisdiction, and have paid all taxes shown to be due and payable on

- 3 -

such returns and all other taxes and assessments payable by the Borrowers, to the extent such taxes and assessments have become due and payable and before they have become delinquent, except for any taxes and assessments the amount of which would not reasonable be expected to have a Material Adverse Effect or the amount, applicability or validity of which is currently being contested in good faith by appropriate proceedings.

    Section 3.8   GOVERNMENTAL LICENSES AND PERMITS.  PGW owns or possesses all governmental licenses and permits that are material to its business, except for those where the failure to own or possess the same have not resulted in and could not reasonably be expected to result in a Material Adverse Effect.

    Section 3.9   COMPLIANCE WITH ERISA.  PGW has operated and administered each plan subject to the Employee Retirement Income Security Act of 1974, as amended, in compliance with all applicable laws except for such instances of noncompliance as have not resulted in and could not reasonably be expected to result in a Material Adverse Effect.

    Section 3.10  OFAC.  No Borrower: is a Sanctioned Person, has more than 10% of its assets in Sanctioned Entities, or derives more than 10% of its operating income from investments in, or transactions with any persons who at the time of such investment or transaction were Sanctioned Persons or Sanctioned Entities. *"Sanctioned Person"* means a person named on the list of Specially Designated Nationals or Blocked Persons maintained by U.S. Department of the Treasury's Office of Foreign Assets Control, and *"Sanctioned Entity"* means an agency of the government of, an organization directly or indirectly controlled by, or a person resident in a country that is subject to a sanctions program identified on the list maintained by OFAC and available at http://www.treas.gov/offices/ enforcement/ofac/programs/index.shtml, or as otherwise published from time to time as such program may be applicable to such agency, organization or person.

    Section 4.   REPRESENTATIONS AND WARRANTIES OF EACH PURCHASER.

    Each Purchaser, severally and not jointly, as of the date of the Closing with such Purchaser, represents and warrants that:

    Section 4.1   PURCHASE FOR INVESTMENT.  Such Purchaser is purchasing its Note for its own account and not with a view to the distribution thereof.  Each Purchaser understands that the Notes have not been registered under the Securities Act of 1933, as amended (the *"Securities Act"*) and may be resold only if registered pursuant to the provisions of the Securities Act or if an exemption from registration is available, except under circumstances where neither such registration nor such an exemption is required by law, and that the Borrower is not required to register the Notes under the Securities Act.

    Section 4.2   ACCREDITED INVESTOR; ETC.  Each Purchaser represents that it is an "accredited investor" (as defined in Regulation D under the Securities Act) acting for its own account.  Each Purchaser further represents that such Purchaser has had the opportunity to ask questions of the Borrower and received answers concerning the terms and conditions of the sale of the Notes and the Loan Documents, and that it has such knowledge and experience in financial and business matters as to be able to evaluate the merits and risks of the transactions contemplated by this Agreement, it has the ability to bear the economic risks of this investment,

- 4 -

including a complete loss of such investment, and it is aware of the risks involved. Each Purchaser represents that it has the authority to execute and deliver the Agreement and perform the transactions contemplated herein, and it has its principal residence or chief executive officer in the state indicated on the Purchaser's signature page.

Section 5.   BORROWER INFORMATION RIGHTS.

Section 5.1   FINANCIAL STATEMENTS.   For so long as a Purchaser's Note is outstanding, if requested by a Purchaser, PGW agrees to cause to be delivered to such Purchaser monthly financial statements of PHC and PC as internally prepared by PHC and PC, within 30 days after the end of each fiscal month end.

Section 5.2   OTHER REQUESTED INFORMATION. For so long as a Purchaser's Note is outstanding, if requested by a Purchaser, but not more often than once per month, TJP, with reasonable promptness, agrees to provide to such Purchaser such other data and information relating to the business, operations, affairs, financial condition, assets or properties of TJP, PGW, PHC or PC as may be reasonably requested by such Purchaser (provided, however, that information with respect to TJP and PGW need not be provided in writing and shall only be provided to Thane Ritchie, subject to the provisions of Section 8.4 hereof).

Section 6.   EVENTS OF DEFAULT; REMEDIES.

Section 6.1   EVENTS OF DEFAULT.   Each of the following events, acts, occurrences or conditions shall constitute an "*Event of Default*" under the Loan Documents, subject to Section 6.2(a):

(a)   The Borrowers shall fail to make when due any payment of principal or interest under any Note when due, and the same shall continue for three business days after written notice to the Borrowers, or the Borrowers shall fail to perform or observe, in any material respect, any other covenant or obligation arising under this Agreement, which failure continues for a period of 15 days after written notice thereof to the Borrower.

(b)   Either Borrower shall commence a voluntary case concerning itself under the Bankruptcy Code; an involuntary case is commenced against either Borrower and the petition is not controverted within ten days, or is not dismissed within 30 days, after commencement of the case; a custodian (as defined in the Bankruptcy Code) is appointed for, or takes charge of, all or substantially all of the property of either Borrower, or either Borrower commences any other proceedings under any reorganization, arrangement, adjustment of debt, relief of debtors, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to either Borrower or there is commenced against either Borrower any such proceeding which remains undismissed for a period of 60 days; or either Borrower is adjudicated bankrupt.

(c)   TJP shall no longer directly or indirectly own 100% of the issued and outstanding equity interests of PGW, PHC or PC.

(d)      Final judgment or judgments (after the expiration of all times to appeal therefrom) for the payment of money in excess of $50,000,000.00 in the aggregate shall be rendered against TJP, PGW, PHC or PC and the same shall not be (i) fully covered by insurance or (ii) vacated, stayed, bonded, paid or discharged for a period of 30 days.

(e)      The provisions of the Subordination Agreement shall have been violated or, except for expiration in accordance with its terms, the Subordination Agreement shall be terminated or shall cease to be in full force and effect.

Section 6.2    REMEDIES.

(a)      If any Event of Default has occurred and is continuing, any holder or holders of more than 50% in aggregate principal amount of the Notes at the time outstanding (the "*Required Holders*") may at any time at its or their option, declare all the Notes then outstanding to be immediately due and payable. Such notice (and any notice given under Section 6.1(a)) shall be given by certified mail, postage prepaid and return receipt requested, delivered by hand, or sent by Federal Express or other reputable overnight courier, at the address set forth above, attention Thomas J. Petters and attention Chief Legal Officer (unless the Borrower shall have given the Purchasers notice of a different address for purposes of such notices).

(b)      Prior to an Event of Default, payments may be made with respect to a Note as agreed by the Borrowers and the applicable Purchaser or holder of a Note. Following an Event of Default, all payments by the Borrowers with respect to the Notes shall be made to the holders of the Notes pro rata and *pari passu* among them according to the principal amount of Notes owned by them, and upon payment in full of such principal, based on any accrued but unpaid interest thereon (collectively, "*Pro Rata Share*"). In the event that any holder of a Note, a Purchaser or the Administrative Agent receives a payment from or on behalf of the Borrowers with respect to the Notes (including proceeds of any collateral under instruments securing the Notes) that is in excess of the amount to which a holder of a Note is entitled under the preceding sentence, such person shall hold such excess amounts in trust for the benefit of the other holders of the Notes and shall promptly pay to such other holders of the Notes the amounts to which they are entitled under the preceding sentence, provided, however, that a holder, a Purchaser or the Administrative Agent, as applicable, shall be entitled to first recover their enforcement costs incurred, including reasonable attorneys fees, incurred in connection therewith.

(c)      No holder of a Note, nor any Purchaser or the Administrative Agent shall pursue any rights or remedies against either Borrower with respect to the Notes or the other Loan Documents unless the Required Holders have approved the same. Further, if the Required Holders so approve, the Administrative Agent may pursue the rights and remedies of the Purchaser and holders of the Notes with respect to the Notes and this Agreement.

Section 7.    ADMINISTRATIVE AGENT.

- 6 -

Section 7.1    APPOINTMENT. Each Purchaser and each subsequent holder of any Note hereby irrevocably appoints and authorizes the Administrative Agent to perform the duties of the Administrative Agent as set forth in the Loan Documents, including, without limitation: to execute or file any and all financing or similar statements or notices, amendments, renewals, supplements, documents, instruments, proofs of claim, notices and other written agreements with respect to the Loan Document; to collect any and all payments under the Notes, to perform, exercise, and enforce any and all other rights and remedies of the Purchasers or such holders with respect to the Borrowers, the Notes, or otherwise related to any of the same to the extent reasonably incidental to the exercise by the Administrative Agent of the rights and remedies authorized to be exercised by the Administrative Agent by the terms of the Loan Documents; to incur and pay such fees necessary or appropriate for the performance and fulfillment of its functions and powers: and to take such action as the Administrative Agent deems appropriate on its behalf to administer the Loan Documents together with such powers as are reasonably incidental thereto to carry out the purposes hereof and thereof. As to any matters not expressly provided for by the Loan Documents (including, without limitation, enforcement or collection of the Notes), the Administrative Agent shall not be required to exercise any discretion or take any action, but shall be required to act or to refrain from acting (and shall be fully protected in so acting or refraining from acting) upon the instructions of the Required Holders, and such instructions of the Required Holders shall be binding upon all Purchasers and holders of the Notes. The Purchasers hereby irrevocably authorize the Administrative Agent, at its option and in its discretion, to release any lien granted to or held by the Administrative Agent upon any collateral upon payment in full of the Notes or otherwise, as determined by the Administrative Agent.

Section 7.2    EXCULPATION. The Administrative Agent shall not have a fiduciary relationship in respect of any Purchaser or Note holder. Nothing in any Loan Document is intended to or shall be construed to impose upon the Administrative Agent any obligations in respect of the Loan Documents except as expressly set forth herein or therein. Each Purchaser shall make its own independent investigation of the financial condition and affairs of the Borrowers and the collateral securing the Notes.    The Administrative Agent and its affiliates shall not be liable for any action taken or omitted to be taken by them under or in connection with the Loan Documents, except for their own gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction. The Administrative Agent shall be entitled to rely upon any instruction believed by it in good faith to be genuine and correct.

Section 7.3    INDEMNIFICATION. To the extent that the Administrative Agent is not reimbursed by the Borrowers, the Purchasers will reimburse and indemnify the Administrative Agent from and against any and all liabilities, losses and costs, including reasonable attorneys' fees, which may be incurred by the Administrative Agent for serving as the Administrative Agent, in proportion to each Purchaser's Pro Rata Share; provided, however, that no Purchaser shall be liable with respect thereto for which there has been a final judicial determination that such liability resulted from the Administrative Agent's gross negligence or willful misconduct. The obligations of the Purchasers under this Section shall survive the payment in full of the Notes.

Section 7.4 ADMINISTRATIVE AGENT AS A PURCHASER. If the Administrative Agent is also a Purchaser, with respect to its Pro Rata Share and the Note issued to it, the Administrative Agent shall have and may exercise the same rights and powers hereunder and is subject to the same obligations and liabilities as and to the extent set forth herein for any other Purchaser.

Section 7.5 SUCCESSOR ADMINISTRATIVE AGENT. The Administrative Agent may resign from the performance of all its functions and duties under the Loan Documents at any time by giving prior written notice to the Borrowers and each Purchaser. Such resignation shall take effect upon the acceptance by a successor Administrative Agent of appointment approved by the Required Holders. The Required Holders may also remove the then serving Administrative Agent at any time upon written notice to the then serving Administrative Agent, and may appoint a successor Administrative Agent.

Section 8. MISCELLANEOUS.

Section 8.1 SURVIVAL. All representations and warranties contained herein shall survive the execution and delivery of the Loan Documents, the purchase or transfer by any Purchaser of any Note or portion thereof or interest therein.

Section 8.2 ENTIRE AGREEMENT. The Loan Documents embody the entire agreement and understanding between the Purchasers and the Borrower regarding the subject matter hereof and supersede all prior agreements and understandings relating to the subject matter hereof.

Section 8.3 AMENDMENT AND WAIVER. The Loan Documents may be amended, and the observance of any term of any Loan Document may be waived either retroactively or prospectively, with the written consent of the Borrowers and the Required Holders. Any amendment or waiver consented to as provided in this Section shall be binding upon all Purchasers and each future holder of any Note and upon the Borrowers. In addition to and not in lieu of any waiver that may be effected by the Required Holders, any Purchaser or any holder of a Note issued to such Purchaser may waive any term of any Loan Document applicable to such Purchaser or Note holder.

Section 8.4 CONFIDENTIAL INFORMATION.

(a) "*Confidential Information*" means information delivered to any Purchaser, Note holder or Administrative Agent, or its affiliates by or on behalf of the Borrowers or their affiliates in connection with the transactions contemplated by the Loan Documents or otherwise, that such recipient knows or reasonably should know is proprietary or confidential in nature, *provided* that such term does not include information that (i) was publicly known or otherwise known to such recipient prior to the time of such disclosure, (ii) subsequently becomes publicly known through no act or omission by such recipient or any person acting on such recipient's behalf, or (iii) otherwise becomes known to such recipient other than through disclosure by or on behalf of the Borrowers or their affiliates.

(b) Each Purchaser, Note holder and Administrative Agent will maintain the confidentiality of such Confidential Information in accordance with procedures adopted by such recipient in good faith to protect confidential information of third parties

delivered to such recipient, *provided* that such recipient may deliver or disclose Confidential Information to (i) such Purchaser's directors, officers, members, shareholders, employees, owners, agents, attorneys and affiliates (to the extent such disclosure reasonably relates to the administration of the investment represented by such recipient's Notes), (ii) such recipient's financial advisors and other professional advisors who agree to hold confidential the Confidential Information substantially in accordance with the terms of this Section, (iii) any other holder of any Note, (iv) any person that proposes to purchase a Note from a Purchaser, if such person has agreed in writing prior to its receipt of such Confidential Information to be bound by the provisions of this Section, or (v) any other person to which such delivery or disclosure (A) may be necessary or appropriate to effect compliance with any law applicable to such recipient, in response to any subpoena or other legal process, or in connection with any litigation to which such recipient is a party, or (B) if an Event of Default has occurred and is continuing, to the extent such recipient may reasonably determine such delivery and disclosure to be necessary or appropriate in the enforcement or for the protection of the rights and remedies under the Notes and the Loan Documents. In the case of any request for disclosure of Confidential Information by a holder pursuant to clause (v)(A) of this Section, to the extent permitted by law, such holder shall use reasonable efforts to notify the Borrower of any request or requirement to disclose such Confidential Information.

(c)     Each holder of a Note, by its acceptance of a Note, will be deemed to have agreed to be bound by this Agreement, including this Section, as though it were a party to this Agreement.

Section 8.5     SUCCESSORS AND ASSIGNS. All covenants and other agreements contained in this Agreement by or on behalf of any of the parties hereto bind and inure to the benefit of their respective successors and assigns (including, without limitation, any subsequent permitted holder of a Note) whether so expressed or not.

Section 8.6     PAYMENTS DUE ON NON-BUSINESS DAYS. Anything in this Agreement or the Notes to the contrary notwithstanding, any payment of principal of or premium or interest on any Note that is due on a date other than a business day shall be made on the next succeeding business day.

Section 8.7     SEVERABILITY; USURY.     Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall (to the full extent permitted by law) not invalidate or render unenforceable such provision in any other jurisdiction. In the event that any interest rate on any Note exceeds the maximum rate permitted by applicable law, the interest rate shall be reduced to the maximum rate permitted by applicable law.

Section 8.8     COUNTERPARTS. This Agreement may be executed in any number of counterparts, each of which shall be an original but all of which together shall constitute one instrument. Each counterpart may consist of a number of copies hereof, each signed by less than all, but together signed by all, of the parties hereto.

- 9 -

Section 8.9    GOVERNING LAW. This Agreement shall be construed and enforced in accordance with, and the rights of the parties shall be governed by, the law of the State of Illinois, excluding conflict of laws principles.

Very truly yours,

*THE BORROWERS:*

PETTERS GROUP WORLDWIDE, LLC

By:
Its:

Thomas J. Petters

*THE ADMINISTRATIVE AGENT:*

RITCHIE CAPITAL MANAGEMENT, LLC

By:
Its:

- 11 -

Very truly yours,

*THE BORROWERS:*

PETTERS GROUP WORLDWIDE, LLC

By: _____

Its: _____

_____

Thomas J. Petters

*THE ADMINISTRATIVE AGENT:*

RITCHIE CAPITAL MANAGEMENT, LLC

By: _____

Its: President

- 11 -

PURCHASER SIGNATURE PAGE
TO
NOTE PURCHASE AGREEMENT

Purchaser Name:                    Ritchie Special Credit Investments, Ltd.
                                   By: Ritchie Capital Management, L.L.C., its Sub-
                                   Advisor

Signature:

Title of Signor:                   President

Principal Amount of Note to be Purchased:   $31,000,000.00

Date of Note to be Purchased:      February 1, 2008

Address:                           c/o Ritchie Capital Management, L.L.C.
                                   801 Warrenville Road, Suite 650
                                   Lisle, Illinois  60532

Telephone:                         (630) 786-4000

Fax:                               (630) 810-5240

Email:                             RCMLegalTeam@ritchiecapital.com

State of Residency/Chief Executive Office:  Cayman Islands

Taxpayer ID No.:                   98-0413419

PURCHASER SIGNATURE PAGE
TO
NOTE PURCHASE AGREEMENT

Purchaser Name:                              Ritchie Special Credit Investments, Ltd.
                                             By: Ritchie Capital Management, L.L.C., its Sub-
                                             Adviser

Signature:

Title of Signor:                             President

Principal Amount of Note to be Purchased:    $31,000,000.00

Date of Note to be Purchased:                February 4, 2008

Address:                                     c/o Ritchie Capital Management, L.L.C.
                                             801 Warrenville Road, Suite 650
                                             Lisle, Illinois 60532

Telephone:                                   (630) 786-4000

Fax:                                         (630) 810-5240

Email:                                       RCMLegalTeam@ritchiecapital.com

State of Residency/Chief Executive Office:   Cayman Islands

Taxpayer ID No.:                             98-0413419

PURCHASER SIGNATURE PAGE
TO
NOTE PURCHASE AGREEMENT

Purchaser Name:    Ritchie Special Credit Investments, Ltd.
                   By: Ritchie Capital Management, L.L.C., its Sub-
                   Adviser

Signature:

Title of Signor:    Presiden t

Principal Amount of Note to be Purchased:    $9,000,000.00

Date of Note to be Purchased:    February 4, 2008

Address:    c/o Ritchie Capital Management, L.L.C.
            801 Warrenville Road, Suite 650
            Lisle, Illinois  60532

Telephone:    (630) 786-4000

Fax:    (630) 810-5240

Email:    RCMLegalTeam@ritchiecapital.com

State of Residency/Chief Executive Office:  Cayman Islands

Taxpayer ID No.:    98-0413419

PURCHASER SIGNATURE PAGE
TO
NOTE PURCHASE AGREEMENT

Purchaser Name:                     Ritchie Special Credit Investments, Ltd.
                                    By: Ritchie Capital Management, L.L.C., its Sub-
                                    Advisor

Signature:

Title of Signor:                    President

Principal Amount of Note to be Purchased:  $4,000,000.00

Date of Note to be Purchased:       February 7, 2008

Address:                            c/o Ritchie Capital Management, L.L.C.
                                    801 Warrenville Road, Suite 650
                                    Lisle, Illinois 60532

Telephone:                          (630) 786-4000

Fax:                                (630) 810-5240

Email:                              RCMLegalTeam@ritchiecapital.com

State of Residency/Chief Executive Office:  Cayman Islands

Taxpayer ID No.:                    98-0413419

PURCHASER SIGNATURE PAGE
TO
NOTE PURCHASE AGREEMENT

Purchaser Name:                                    Ritchie Special Credit Investments, Ltd.
                                                   By Ritchie Capital Management, L.L.C., its Sub-
                                                   Adviser

Signature:

Title of Signor:                                   President

Principal Amount of Note to be Purchased:   $9,000,000.00

Date of Note to be Purchased:               February 19, 2008

Address:                                    c/o Ritchie Capital Management, L.L.C.
                                            801 Warrenville Road, Suite 650
                                            Lisle, Illinois 60532

Telephone:                                  (630) 786-4000

Fax:                                        (630) 810-5240

Email:                                      RCMLegalTeam@ritchiecapital.com

State of Residency/Chief Executive Office:  Cayman Islands

Taxpayer ID No.:                            98-0413419

PURCHASER SIGNATURE PAGE
TO
NOTE PURCHASE AGREEMENT

Purchaser Name:                                Rhone Holdings II. Ltd.

Signature:                                     *Paul S. Wall*

Title of Signor:                               Director

Principal Amount of Note to be Purchased:  $16,000,000.00

Date of Note to be Purchased:              February 4, 2008

Address:                                   c/o Ritchie Capital Management, L.L.C.
                                           801 Warrenville Road, Suite 650
                                           Lisle, Illinois 60532

Telephone:                                 (630) 786-4000

Fax:                                       (630) 810-5240

Email:                                     RCMLegalTeam@ritchiecapital.com

State of Residency/Chief Executive Office: Cayman Islands

Taxpayer ID No.:                           98-0529765

PURCHASER SIGNATURE PAGE
TO
NOTE PURCHASE AGREEMENT

Purchaser Name:                                    Rhone Holdings II. Ltd.

Signature:                                         _Paul S Wolfe_

Title of Signor:                                   _Director_

Principal Amount of Note to be Purchased:  $12,000,000.00

Date of Note to be Purchased:                      February 7, 2008

Address:                                           c/o Ritchie Capital Management, L.L.C.
                                                   801 Warrenville Road, Suite 650
                                                   Lisle, Illinois 60532

Telephone:                                         (630) 786-4000

Fax:                                               (630) 810-5240

Email:                                             RCMLegalTeam@ritchiecapital.com

State of Residency/Chief Executive Office:  Cayman Islands

Taxpayer ID No.:                                   98-0529765

PURCHASER SIGNATURE PAGE
TO
NOTE PURCHASE AGREEMENT

Purchaser Name:                                Rhone Holdings II. Ltd.

Signature:                                     _Paul S Wells_

Title of Signor:                               _Director_

Principal Amount of Note to be Purchased:  $16,000,000.00

Date of Note to be Purchased:              February 19, 2008

Address:                                   c/o Ritchie Capital Management, L.L.C.
                                           801 Warrenville Road, Suite 650
                                           Lisle, Illinois  60532

Telephone:                                 (630) 786-4000

Fax:                                       (630) 810-5240

Email:                                     RCMLegalTeam@ritchiecapital.com

State of Residency/Chief Executive Office:  Cayman Islands

Taxpayer ID No.:                            98-0529765

SCHEDULE A

| Purchaser | Date of Note(s) | Principal Amount of Note |
|---|---|---|
| Ritchie Special Credit Investments, Ltd. | February 1, 2008 | $31,000,000.00 |
| Ritchie Special Credit Investments, Ltd. | February 4, 2008 | $31,000,000.00 |
| Ritchie Special Credit Investments, Ltd. | February 4, 2008 | $ 9,000,000.00 |
| Ritchie Special Credit Investments, Ltd. | February 7, 2008 | $ 4,000,000.00 |
| Ritchie Special Credit Investments, Ltd. | February 19, 2008 | $ 9,000,000.00 |
| Rhone Holdings II., Ltd. | February 4, 2008 | $16,000,000.00 |
| Rhone Holdings II., Ltd. | February 7, 2008 | $12,000,000.00 |
| Rhone Holdings II., Ltd. | February 19, 2008 | $16,000,000.00 |
| Yorkville Investments I., LLC | February 5, 2008 | $13,000,000.00 |
| Yorkville Investments I., LLC | February 15, 2008 | $ 5,000,000.00 |
| Ark Discovery II, LP | February 13, 2008 | $ 3,000,000.00 |
| Ark Discovery II, LP | February 15, 2008 | $ 3,000,000.00 |

- 13 -

B

EXECUTION COPY

## EXTENSION AND AMENDMENT AGREEMENT

This EXTENSION AND AMENDMENT AGREEMENT (this "Agreement"), dated as of September 19, 2008, is entered into by and among Thomas J. Petters ("TJP"), Petters Group Worldwide, LLC, a Delaware limited liability company ("PGW"), Petters Company, Inc., a Minnesota corporation ("PCI" and, collectively with TJP and PGW, the "Borrowers"), Ritchie Special Credit Investments, Ltd., a Cayman Islands exempted company ("Special Credit"), Rhone Holdings II. Ltd., a Cayman Islands exempted company ("Rhone II"), Yorkville Investment I., L.L.C., a Delaware limited liability company ("Yorkville"), Ritchie Capital Structure Arbitrage Trading, Ltd., a Cayman Islands exempted company ("Cap Structure" and, collectively with Special Credit, Rhone II and Yorkville, the "Note Purchasers"), and Ritchie Capital Management, L.L.C., a Delaware limited liability company, in its capacity as administrative agent for certain of the Note Purchasers under the Note Purchase Agreement (as defined below) (the "Collateral Agent").

### RECITALS:

WHEREAS, (i) TJP is the registered and beneficial owner of all of the outstanding membership or other equity interests of PGW, PCI and Thomas Petters, Inc. ("TPI"), (ii) PGW is the registered and beneficial owner of all of the issued and outstanding shares of capital stock, membership or other equity interests of Petters Capital, LLC ("PC") and Polaroid Holding Company, a Delaware corporation ("PHC"), and (iii) PHC is the registered and beneficial owner of all of the issued and outstanding shares of capital stock of Polaroid Corporation, a Delaware corporation ("Polaroid");

WHEREAS, TJP and PGW have issued the promissory notes (the "February Notes") in the original principal amounts and to the Note Purchasers (the "February Note Purchasers") as set forth on Schedule A-1 attached hereto, pursuant to a Note Purchase Agreement dated as of February 19, 2008 (the "Note Purchase Agreement");

WHEREAS, TJP, PGW and PCI have issued the promissory notes (the "May Notes" and, collectively with the February Notes, the "Notes") in the original principal amounts and to the Note Purchasers (the "May Note Purchasers") as set forth on Schedule A-2 attached hereto;

WHEREAS, pursuant to the terms of the Notes (as amended as of the date hereof by certain allonges) and the Note Purchase Agreement, the entire principal amount of all of the Notes, and all accrued and unpaid interest thereon, was due and payable on August 31, 2008;

WHEREAS, as of the date hereof, the entire principal amount of all of the Notes, and all accrued interest thereon, remains unpaid; and

WHEREAS, (i) the February Note Purchasers are the holders of 100% of the February Notes set forth on Schedule A-1, (ii) the February Note Purchasers are the holders of more than 50% in aggregate principal amount of all of the promissory notes issued and sold under the Note Purchase Agreement, and therefore constitute the "Required Holders" (as defined in the Note Purchase Agreement) under the Note Purchase Agreement, and (iii) as a result of the facts set forth in clauses (i) and (ii) of this recital, the February Note Purchasers are authorized, with the consent of TJP and PGW, to amend the February Notes and the Note Purchase Agreement;

WHEREAS, the May Note Purchasers are the holders of 100% of the May Notes set forth on Schedule A-2 and therefore are authorized, with the consent of the Borrowers, to amend the May Notes;

WHEREAS, the Borrowers have requested that (i) the Note Purchasers agree to amend the Notes to, among other things, extend the final maturity dates of the Notes and modify certain aspects of the interest rates applicable to the May Notes and (ii) the February Note Purchasers agree to amend certain provisions of the Note Purchase Agreement, all pursuant to the terms set forth in this Agreement, and the Note Purchasers are willing to execute this Agreement, subject to the conditions precedent that (x) Polaroid shall have executed the Trademark Security Agreement, in the form attached as Exhibit A hereto (the "Polaroid Security Agreement"), in favor of the Collateral Agent and for the benefit of the Note Purchasers, (y) PCI and TPI shall have executed the PCI Pledge and Security Agreement, in the form attached as Exhibit B hereto (the "PCI Security Agreement"), in favor of the Collateral Agent and for the benefit of the Note Purchasers, and (z) PCI shall have executed the Thousand Lakes Pledge and Security Agreement, in the form attached as Exhibit C hereto (the "Thousand Lakes Security Agreement" and, collectively with the Polaroid Security Agreement, the PCI Security Agreement and the PC Security Agreement (as defined in Section 5(e) below), the "Security Agreements"), in favor of the Collateral Agent and for the benefit of the Note Purchasers.

NOW, THEREFORE, in consideration of the mutual agreements contained in this Agreement and the Security Agreements, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## SECTION 1. Definitions.

(a) The "Effective Date" of this Agreement shall mean the date hereof.

(b) Unless otherwise defined above or elsewhere in this Agreement, capitalized terms used herein shall have the meanings ascribed to them in the Note Purchase Agreement.

## SECTION 2. Confirmation by Borrowers of Obligations Under the Notes.

(a) The Borrowers acknowledge and agree that (i) the unpaid principal amount of each of the Notes as of August 31, 2008 is as set forth opposite each Note on Schedules A-1 and A-2 under the heading "Principal Amount of Note as of August 31, 2008", (ii) the amount of accrued and unpaid interest on each of the Notes as of August 31, 2008 is as set forth opposite each Note on Schedules A-1 and A-2 under the heading "Accrued and Unpaid Interest as of August 31, 2008", and (iii) the unpaid principal amount of each of the Notes as of September 1, 2008 is as set forth opposite each Note on Schedules A-1 and A-2 under the heading "Principal Amount of Note as of 12.01 A.M. on September 1, 2008." For avoidance of doubt, the parties agree and acknowledge that the amount of accrued and unpaid interest on each of the Notes as of August 31, 2008 has been added to the principal amount of the Note upon which such accrued interest was payable, as reflected under the heading "Principal Amount of Note as of 12:01 A.M. on September 1, 2008."

(2)

(b) The foregoing amounts do not include fees, expenses and other amounts which are chargeable or otherwise reimbursable under the Note Purchase Agreement and the Notes.

(c) For avoidance of doubt, the Borrowers agree and acknowledge that interest on each of the Notes shall accrue and be payable on the unpaid principal amount of each of the Notes set forth opposite each Note on Schedules A-1 and A-2 under the heading "Principal Amount of Note as of 12:01 A.M. on September 1, 2008" from and including September 1, 2008 through and including the Maturity Date of each Note (as each such Maturity Date is amended as set forth in Section 3(a)(i) below), at the interest rate specified in each such Note (taking into account, with respect to the May Notes, the amendment set forth in Section 3(a)(ii) below). All such interest shall be calculated as set forth in the respective Notes, and all accrued and unpaid interest shall be payable in full on the Maturity Date, or earlier repayment in full, of each of the Notes.

**SECTION 3. Amendments to the Notes and the Note Purchase Agreement.**

(a) Effective as of the Effective Date, the parties hereto agree that the Notes are hereby amended as follows:

(i) The Maturity Date (as defined in each of the Notes) of each of the Notes shall be extended such that the new Maturity Date of each of the Notes shall be December 19, 2008.

(ii) Effective as of May 30, 2008, the rate of interest payable on the May Notes shall be 80% per annum. The amount of accrued and unpaid interest on the May Notes that is set forth on Schedule A-2 hereto under the heading "Accrued and Unpaid Interest as of August 31, 2008" reflects this retroactive adjustment of the interest rate on the May Notes.

(iii) The May Notes shall be subject to all of the terms and provisions of the Note Purchase Agreement, as if the May Notes were issued under the Note Purchase Agreement (and, accordingly, if an Event of Default has occurred with respect to the February Notes, an Event of Default shall also be deemed to have occurred under the May Notes).

(b) Effective as of the Effective Date, the parties hereto agree that the Note Purchase Agreement is hereby amended as follows:

(i) Section 6.1 of the Note Purchase Agreement is hereby amended as follows:

(A) Clause (c) of Section 6.1 of the Note Purchase is hereby amended and restated to read in its entirety as follows:

"(c) TJP shall no longer directly or indirectly own 100% of the issued and outstanding equity interests of PGW, PCI, Petters Capital, LLC, Thomas Petters, Inc. or Thousand Lakes, LLC."

(3)

(B) the following new subsections (f), (g) and (h) are hereby added to Section 6.1 of the Note Purchase Agreement:

"(f) Any representation or warranty made by the Borrowers under the Extension and Amendment Agreement, dated as of September 19, 2008, by and among the Borrowers and the Collateral Agent, is breached or proves to have been incorrect in any material way when made or, if it had been made on any later date by reference to the circumstances then existing, would have been incorrect in any material respect on that later date.

(g) TJP shall no longer directly or indirectly own at least 50.1% of the issued and outstanding equity interests of either of PHC or Polaroid Corporation.

(h) Except for expiration in accordance with its terms, the Pledge and Security Agreement, dated as of September 19, 2008, by and between Petters Company, Inc. and Ritchie Capital Management, L.L.C. (the "Thousand Lakes Security Agreement"), shall be terminated or shall cease to be in full force and effect, or any lien or security interest intended to be created by the Thousand Lakes Security Agreement shall at any time be invalidated, subordinated or otherwise cease to be in full force and effect, for whatever reason, or any security interest purported to be created by the Thousand Lakes Security Agreement shall cease to be, or shall be asserted by Thousand Lakes, LLC not to be, a valid, perfected, first priority security interest in the collateral covered thereby."

(ii) Section 6.2(a) of the Note Purchase Agreement is hereby amended and restated to read in its entirety as follows:

"(a) If any Event of Default has occurred and is continuing, any holder or holders of more than 80% in aggregate principal amount of the Notes at the time outstanding (the "*Required Holders*") may at any time at its or their option, declare all the Notes then outstanding to be immediately due and payable. Such notice (and any notice given under Section 6.1(a)) shall be given by certified mail, postage prepaid and return receipt requested, delivered by hand, or sent by Federal Express or other reputable overnight courier, at the address set forth above, attention Thomas J. Petters and attention Chief Legal Officer (unless the Borrower shall have given the Purchasers notice of a different address for purposes of such notices)."

## SECTION 4. Deliveries.

Contemporaneously with the execution and delivery of this Agreement:

(a)     Borrowers and the Note Purchasers shall deliver to the Collateral Agent signature pages for this Agreement, duly executed by the Borrowers and the Note Purchasers;

(4)

(b)     Polaroid shall deliver to the Collateral Agent the Polaroid Security Agreement, duly executed by Polaroid;

(c)     PCI shall deliver to the Collateral Agent the Thousand Lakes Security Agreement, duly executed by TJP and PCI, together with an originally executed certificate evidencing the Pledged Securities (as defined in the Thousand Lakes Security Agreement); and

(d)     TPI and PCI shall deliver to the Collateral Agent the PCI Security Agreement, duly executed by TPI and PCI, together with the originally executed Pledged Notes (as defined in the PCI Security Agreement).

## SECTION 5. Certain Agreements.

(a)     TJP covenants and agrees that from and after the date hereof (except as otherwise provided herein, or unless the Collateral Agent has given its prior written consent), so long as any of the Notes are outstanding, he shall not take any action (whether in his capacity as an equity holder, member, manager or director of Polaroid or any affiliate thereof, or otherwise) that would cause Polaroid to violate the covenants set forth in Section 4 of the Polaroid Security Agreement.

(b)     TJP and PCI each covenant and agree that from and after the date hereof (except as otherwise provided herein, or unless the Collateral Agent has given its prior written consent), so long as any of the Notes are outstanding, neither TJP nor PCI shall take any action (whether in the capacity of either such party as an equity holder, member, manager or director of Thousand Lakes, LLC or any affiliate thereof, or otherwise) that would cause Thousand Lakes, LLC to:

(i)  directly or indirectly contract, create, incur, assume, guarantee or suffer to exist any indebtedness, except for Permitted Thousand Lakes Indebtedness;

(ii)  create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the assets of Thousand Lakes, LLC of any kind, whether now owned or hereafter acquired, or any income or profits therefrom, other than as created pursuant to, or permitted under, the Thousand Lakes Loan Agreement; or

(iii)  lend money or credit or make advances to any person, or purchase, acquire or invest in any stock, obligations or securities of, or any other interest in, or make any capital contribution to, or purchase or otherwise acquire all or substantially all of the assets or business of, or a division or product line of, any person, in each case other than as permitted under the Thousand Lakes Loan Agreement.

As used in this Section 5(b):

"Permitted Thousand Lakes Indebtedness" means indebtedness permitted and/or incurred under the Thousand Lakes Loan Agreement; and

"Thousand Lakes Loan Agreement" means the Master Loan Agreement dated as of October 11, 2002, as amended as of the date hereof, by and between Thousand Lakes, LLC, the lenders party thereto and RWB Services LLC, as the same may be amended from time to time

1426039 V 2

(provided that RWB Services LLC, or an affiliate thereof, shall at all times be the administrative agent under such loan agreement).

(c)     TJP covenants and agrees that he shall not directly or indirectly sell, transfer, assign, pledge or otherwise dispose of, or directly or indirectly cause a sale, transfer, assignment, pledge or other disposition of, (i) any of the capital stock or other equity interests of PHC or Polaroid (whether pursuant to a transaction effected by TJP or by the issuer of such capital stock or other equity interests), or (ii) all or substantially all of the assets of PHC or Polaroid, other than pursuant to a Permitted Polaroid Transaction.

As used in this Section 5(c), "Permitted Polaroid Transaction" means either (1) any transaction that is effected in connection with the incurrence of "Permitted Polaroid Indebtedness" (as defined in the Polaroid Security Agreement), or (2) a transaction or related series of transactions pursuant to which (i) a maximum of 49.9% of the issued and outstanding capital stock or other equity interests in PHC or Polaroid is sold, transferred, assigned, pledged or otherwise disposed of (whether pursuant to a transaction effected by TJP or by the issuer of such capital stock or other equity interests) (with the determination of "issued and outstanding" being on a pro forma basis, after giving effect to the proposed Permitted Polaroid Transaction), in an arm's length transaction, to an entity or individual that is not an affiliate of TJP and which transaction is not in respect of any antecedent debt or other antecedent obligations of TJP or any affiliate of TJP, and (ii) fifty percent (50%) of the proceeds or other consideration of such transaction or series of transactions (net of any reasonable, out-of-pocket expenses directly related thereto) are paid at the closing of such transaction(s) to the Collateral Agent, for application by the Collateral Agent to the Notes. To the extent that any portion of the proceeds or other consideration of such transaction or series of transactions consists of non-cash consideration (such as a promissory note or similar instrument, securities or other real or personal property) that is not readily divisible or liquid at such closing, TJP agrees that he shall cause there to be paid to the Collateral Agent fifty percent (50%) of the amount of cash ultimately realized from time to time in respect of such non-cash consideration (whether at maturity, upon any prepayment or upon a sale of any such instrument, upon a sale of such real or personal property or such other time(s) as such consideration is reduced to cash), promptly following consummation of the relevant event or action that results in such non-cash consideration being reduced to cash.

(d)     Promptly after any of the Borrowers knows or has reason to believe that any Event of Default (as defined in Note Purchase Agreement, as amended hereby, or in any of the Security Agreements) has occurred, Borrowers shall provide written notice of such Event of Default describing the same in reasonable detail and, together with such notice or as soon thereafter as practicable, a description of the action that the Borrowers have taken or propose to take with respect to such Event of Default.

(e)     TJP agrees and covenants that he shall cause PC to execute the PC Security Agreement, in favor of the Collateral Agent and for the benefit of the Note Purchasers and RWB Services LLC, by no later than 4:00 p.m., Central Time, on September 26, 2008. As used herein, "PC Security Agreement" means a security agreement in form and substance satisfactory to the Collateral Agent (which such form the parties agree shall be based upon the form of the PCI Security Agreement), pursuant to which PC shall pledge to a wholly-owned subsidiary of the Collateral Agent the "PC Pledged Notes" set forth on Schedule B hereto.

(f)    The Borrowers agree that the occurrence of either of the following shall constitute an Event of Default under the Notes, the Note Purchase Agreement and the Security Agreements:

> (i)    any failure to perform or observe, in any material respect, any of the covenants or obligations arising under Section 5 of this Agreement;
>
> (ii)   PC shall not have executed and delivered to the Collateral Agent the PC Security Agreement by 4:00 p.m., Central Time, on September 26, 2008;
>
> (iii)  Thousands Lakes, LLC shall not have executed and delivered a Direction Letter to RWB Services, LLC and the Collateral Agent (or its assignee) by 4:00 p.m., Central Time, on September 26, 2008. As used herein, "Direction Letter" means a letter from Thousand Lakes, LLC directing the administrative agent under the Thousand Lakes Loan Agreement to transfer any proceeds referenced in Section 2.6(b) of the Thousand Lakes Loan Agreement required by the terms thereof to be paid to the Borrower, to be paid to the Collateral Agent or its designee.

(g)    The Note Purchasers covenant and agree that, so long as no Event of Default has occurred under the Notes, the Note Purchase Agreement or the Security Agreements, the failure of the Borrowers to repay in full at maturity all of the obligations owed by the Borrowers under the Burnham Note shall not be considered to be an "Event of Default" under the Note Purchase Agreement. As used in this Section 5(g), "Burnham Note" means the Promissory Note, dated February 4, 2008, in the principal amount of $16,000,000.00 by TJP and PGW to the order of Rhone Holdings II. Ltd., which note was assigned by Rhone Holdings II. Ltd. to Vicis Capital Master Fund Ltd. on February 19, 2008.

(h)    The Borrowers shall (i) provide the Collateral Agent copies of audited and unaudited financial statements regularly prepared in accordance with past practices for each of the Borrowers within 15 days after such financial statements are so prepared, (ii) upon the request of Collateral Agent, provide to Collateral Agent copies of the audited and unaudited historical financial statements for each of the Borrowers to the extent previously prepared, (iii) provide such other information as the Collateral Agent may reasonably request regarding the Borrowers, and (iv) make its officers and employees reasonably available to Collateral Agent to answers the reasonable information requests of the Collateral Agent with respect thereto.

## SECTION 6. General Release; Indemnity.

(a) In consideration of, among other things, Collateral Agent's and Note Purchasers' execution and delivery of this Agreement, each Borrower, on behalf of itself and its agents, representatives, officers, directors, advisors, employees, subsidiaries, affiliates, successors and assigns (collectively, "Releasors"), hereby forever agrees and covenants not to sue or prosecute against any Releasee (as hereinafter defined) and hereby forever waives, releases and discharges, to the fullest extent permitted by law, each Releasee (as hereinafter defined) from any and all claims (including, without limitation, crossclaims, counterclaims, rights of set-off and recoupment), actions, causes of action, suits, debts, accounts, interests, liens, promises, warranties, damages and consequential damages, demands, agreements, bonds, bills,

(7)

specialties, covenants, controversies, variances, trespasses, judgments, executions, costs, expenses or claims whatsoever (collectively, the "Claims"), that such Releasor now has or hereafter may have, of whatsoever nature and kind, whether known or unknown, whether now existing or hereafter arising, whether arising at law or in equity, against any or all of the Note Purchasers in any capacity (including, without limitation, the Collateral Agent) and their respective affiliates, subsidiaries, members, partners, shareholders and "controlling persons" (within the meaning of the federal securities laws), and their respective successors and assigns and each and all of the officers, directors, employees, agents, attorneys and other representatives of each of the foregoing (collectively, the "Releasees"), based in whole or in part on facts, whether or not now known, existing on or before the Effective Date, that relate to, arise out of or otherwise are in connection with: (i) any or all of the Notes, the Note Purchase Agreement, the Security Agreements or transactions contemplated thereby or any actions or omissions in connection therewith, or (ii) any aspect of the dealings or relationships between or among any Borrower, on the one hand, and any or all of the Note Purchasers and the Collateral Agent, on the other hand, relating to any or all of the documents, transactions, actions or omissions referenced in clause (i) hereof. In entering into this Agreement, the Borrowers consulted with, and have been represented by, legal counsel and expressly disclaims any reliance on any representations, acts or omissions by any of the Releasees and hereby agrees and acknowledges that the validity and effectiveness of the releases set forth above do not depend in any way on any such representations, acts and/or omissions or the accuracy, completeness or validity hereof. The provisions of this Section shall survive the termination of this Agreement, the Notes, the Note Purchase Agreement, the Security Agreements and payment in full of the Obligations (as defined in the Polaroid Security Agreement).

(b) Each Borrower hereby agrees that it shall be jointly and severally obligated to indemnify and hold the Releasees harmless with respect to any and all liabilities, obligations, losses, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by the Releasees, or any of them, whether direct, indirect or consequential, as a result of or arising from or relating to any proceeding by, or on behalf of any Person, including, without limitation, the respective officers, directors, agents, trustees, creditors, partners or shareholders of the Borrowers or any of their subsidiaries, whether threatened or initiated, in respect of any claim for legal or equitable remedy under any statute, regulation or common law principle arising from or in connection with the negotiation, preparation, execution, delivery, performance, administration and enforcement of the Notes, the Note Purchase Agreement, the Security Agreements, this Agreement or any other document executed and/or delivered in connection herewith; *provided*, that no Borrower shall have any obligation to indemnify or hold harmless any Releasee hereunder with respect to liabilities to the extent they result from the gross negligence or willful misconduct of that Releasee as finally determined by a court of competent jurisdiction. To the extent that the undertakings to defend, indemnify, pay and hold harmless set forth in this Section 6(b) may be unenforceable in whole or in part because they are violative of any law or public policy, each Borrower agrees to contribute the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all indemnified liabilities hereunder incurred by any of them. The foregoing indemnity shall survive the termination of this Agreement, the Notes, the Note Purchase Agreements and the Security Agreements and the payment in full of the Obligations.

(c) Each Borrower, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with

and in favor of each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Claim released, remised and discharged by the Borrowers pursuant to Section 6 hereof. If any Borrower or any of their successors, assigns or other legal representatives violates the foregoing covenant, each Borrower, for itself and its successors, assigns and legal representatives, agrees to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

## SECTION 7. Representations and Warranties of the Borrowers.

To induce the Collateral Agent and Note Purchasers to execute and deliver this Agreement and consummate the transactions contemplated hereby, each Borrower represents and warrants that:

(a) The execution, delivery and performance by each of the Borrowers of this Agreement, the Security Agreements and all documents and instruments delivered in connection herewith and therewith have been duly authorized by each Borrower's respective board of directors (or similar governing body), and this Agreement, the Security Agreements and all documents and instruments delivered in connection herewith and therewith are legal, valid and binding obligations of each Borrower enforceable against such parties in accordance with their respective terms, except as may be limited by (i) the effect of any applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and (ii) general principles of equity (regardless of whether such enforcement is sought in a proceeding in equity or at law);

(b) Each of the representations and warranties contained in the Note Purchase Agreement is true and correct in all material respects on and as of the date hereof to the same extent as though made on the date hereof, except to the extent that such representations and warranties specifically relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects on and as of such earlier date, and each of the agreements and covenants in the Note Purchase Agreement is hereby reaffirmed with the same force and effect as if each were separately stated herein and made as of the date hereof;

(c) Neither the execution, delivery and performance of this Agreement, the Security Agreements and all documents and instruments delivered in connection herewith nor the consummation of the transactions contemplated hereby or thereby does or shall contravene, result in a breach of, or violate (i) any provision of any Borrower's or Thousand Lakes' charter, bylaws, operating agreement, or other governing documents, (ii) any law or regulation, or any order or decree of any court or government instrumentality, or (iii) any indenture, mortgage, deed of trust, lease, agreement or other instrument to which any Borrower or Thousand Lakes is a party or by which any Borrower, Thousand Lakes or any of their respective property is bound (subject in the case of the Thousand Lakes Security Agreement to receiving any required consents to the pledge contained therein);

(d) As of the date hereof, after giving effect to this Agreement, no Event of Default has occurred or is continuing under this Agreement, the Note Purchase Agreement or any of the Notes; and

(9)

1540505-1

(e) Except as set forth on Schedule 7(e) hereto, as of the date hereof, there is no material claim, legal action, counterclaim, suit, arbitration, governmental investigation, litigation, or any other legal, or administrative proceeding before any governmental authority, nor any order, decree or judgment, pending, or to the Borrowers' knowledge, threatened, against or relating to any of the Borrowers or any Affiliate thereof.

## SECTION 8. Ratification of Liability.

Each of the Borrowers, as debtors the Notes and the Note Purchase Agreement, hereby ratifies and reaffirms all of its payment and performance obligations and obligations to indemnify, contingent or otherwise, under each of such Notes and Note Purchase Agreements to which such party is a party. Each such party (i) further acknowledges receipt of a copy of this Agreement and all other agreements, documents, and instruments executed and/or delivered in connection herewith, (ii) consents to the terms and conditions of same, and (iii) agrees and acknowledges that each of the Notes and the Note Purchase Agreement, as modified hereby, remains in full force and effect and is hereby ratified and confirmed. Except as expressly provided herein, the execution of this Agreement shall not operate as a waiver of any right, power or remedy of any Note Purchaser or the Collateral Agent, nor constitute a waiver of any provision of any of the Notes or Note Purchase Agreement nor constitute a novation of any of the obligations of the Borrowers under the Notes and the Note Purchase Agreement.

## SECTION 9.   Reference to and Effect Upon the Notes and the Note Purchase Agreement.

(a) Except as specifically amended hereby, all terms, conditions, covenants, representations and warranties contained in the Notes and the Note Purchase Agreement, and all rights of the Note Purchasers and all of the obligations of the Borrowers thereunder, shall remain in full force and effect. Each Borrower hereby confirms that the Notes and the Note Purchase Agreement are in full force and effect and that no Borrower has any right of setoff, recoupment or other offset or any defense, claim or counterclaim under the Notes or the Note Purchase Agreement with respect to any of their obligations thereunder

(b) Except as expressly set forth herein, the execution, delivery and effectiveness of this Agreement shall not directly or indirectly (i) create any obligation to defer any enforcement action after the occurrence of any Event of Default, (ii) constitute a consent or waiver of any past, present or future violations of any provisions of the Notes or the Note Purchase Agreement, (iii) amend, modify or operate as a waiver of any provision of the Notes or the Note Purchase Agreement or any right, power or remedy of any Note Purchaser, (iv) constitute a consent to any merger or other transaction or to any sale, restructuring or refinancing transaction, (v) constitute a course of dealing or other basis for altering any obligations of Borrowers under the Notes or the Note Purchase Agreement or any other contract or instrument. Except as expressly set forth herein, the Note Purchasers, the Collateral Agent and each Borrower reserves all of its rights, powers, and remedies under the Notes and the Note Purchase Agreement and applicable law. All of the provisions of the Notes and the Note Purchase Agreement, including, without limitation, the time of the essence provisions, are hereby reiterated.

(10)

(c) From and after the Effective Date, all references to the Notes and the Note Purchase Agreement shall mean the Notes and the Note Purchase Agreement as amended by this Agreement.

(d) No Note Purchaser has waived or is by this Agreement waiving, and no Note Purchaser has any intention of waiving (regardless of any delay in exercising such rights and remedies), any Event of Default which may be continuing on the date hereof or any Event of Default which may occur after the date hereof, and no Note Purchaser has agreed to forbear with respect to any of its rights or remedies concerning any Events of Default, which may have occurred or are continuing as of the date hereof, or which may occur after the date hereof.

(e) The Borrowers confirm their agreement to pay all fees and expenses required to be paid or reimbursed by Borrowers pursuant to the Note Purchase Agreement and the Notes, including all invoiced fees and expenses of counsel to the Collateral Agent and the Note Purchasers.

**SECTION 10.  [Intentionally Omitted].**

**SECTION 11.  Governing Law; Consent to Jurisdiction and Venue.**

THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF ILLINOIS, WITHOUT GIVING EFFECT TO ITS CONFLICT OF LAWS PROVISIONS.

ANY LEGAL ACTION OR PROCEEDING AGAINST BORROWERS WITH RESPECT TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY MAY BE BROUGHT IN THE COURTS LOCATED IN THE STATE OF ILLINOIS, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH BORROWER HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE NON-EXCLUSIVE JURISDICTION OF THE AFORESAID COURTS. EACH OF THE BORROWERS FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF ANY OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO SUCH BORROWER AT ITS ADDRESS AS SET FORTH IN SECTION 8(c) OF THE POLAROID SECURITY AGREEMENT. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE NOTE PURCHASERS OR THE COLLATERAL AGENT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY BORROWER IN ANY OTHER JURISDICTION.

EACH BORROWER HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT IN THE COURTS REFERRED TO ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURT HAS BEEN BROUGHT IN AN INCONVENIENT FORUM.

### SECTION 12.  Construction.

This Agreement and all other agreements and documents executed and/or delivered in connection herewith have been prepared through the joint efforts of all of the parties hereto. Neither the provisions of this Agreement or any such other agreements and documents nor any alleged ambiguity therein shall be interpreted or resolved against any party on the ground that such party or its counsel drafted this Agreement or such other agreements and documents, or based on any other rule of strict construction.  Each of the parties hereto represents and declares that such party has carefully read this Agreement and all other agreements and documents executed in connection therewith, and that such party knows the contents thereof and signs the same freely and voluntarily.  The parties hereto acknowledge that they have been represented by legal counsel of their own choosing in negotiations for and preparation of this Agreement and all other agreements and documents executed in connection herewith and that each of them has read the same and had their contents fully explained by such counsel and is fully aware of their contents and legal effect.  If any matter is left to the decision, right, requirement, request, determination, judgment, opinion, approval, consent, waiver, satisfaction, acceptance, agreement, option or discretion of one or more Note Purchasers or their respective employees, counsel, or agents in this Agreement, the Notes or the Note Purchase Agreement, such action shall be deemed to be exercisable by such Note Purchasers or such other person in their sole and absolute discretion and according to standards established in its sole and absolute discretion.  Without limiting the generality of the foregoing, "option" and "discretion" shall be implied by the use of the words "if" and "may."

### SECTION 13.  Counterparts.

This Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed an original, but all such counterparts shall constitute one and the same instrument, and all signatures need not appear on any one counterpart.  Any party hereto may execute and deliver a counterpart of this Agreement by delivering by facsimile or other electronic transmission a signature page of this Agreement signed by such party, and any such facsimile or other electronic signature shall be treated in all respects as having the same effect as an original signature.  Any party delivering by facsimile or other electronic transmission a counterpart executed by it shall promptly thereafter also deliver a manually signed counterpart of this Agreement.

### SECTION 14.  Severability.

The invalidity, illegality, or unenforceability of any provision in or obligation under this Agreement in any jurisdiction shall not affect or impair the validity, legality, or enforceability of the remaining provisions or obligations under this Agreement or of such provision or obligation in any other jurisdiction.  If feasible, any such offending provision shall be deemed modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it shall be stricken and all other provisions of this Agreement in all other respects shall remain valid and enforceable.

(12)

## SECTION 15. Further Assurances.

Each Borrower agrees to take all further actions and execute all further documents as Collateral Agent may from time to time reasonably request to carry out the transactions contemplated by this Agreement and all other agreements executed and delivered in connection herewith.

## SECTION 16. Section Headings.

Section headings in this Agreement are included herein for convenience of reference only and shall not constitute part of this Agreement for any other purpose.

## SECTION 17. Notices.

All notices, requests, and demands to or upon the respective parties hereto shall be given in accordance with the Notes and the Note Purchase Agreement.

## SECTION 18. Waiver of Jury Trial by Borrowers.

EACH BORROWER, BY ITS ACCEPTANCE OF THIS AGREEMENT, HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

## SECTION 19. Assignments; No Third Party Beneficiaries.

This Agreement shall be binding upon and inure to the benefit of the Borrowers, the Collateral Agent, the Note Purchasers and their respective successors and assigns; *provided*, that no Borrower shall be entitled to delegate any of its duties hereunder and shall not assign any of its rights or remedies set forth in this Agreement without the prior written consent of Collateral Agent in its sole discretion. No person other than the parties hereto, and in the case of Section 6 hereof, the Releasees, shall have any rights hereunder or be entitled to rely on this Agreement and all third-party beneficiary rights (other than the rights of the Releasees under Section 6 hereof) are hereby expressly disclaimed.

## SECTION 20. Final Agreement.

This Agreement, the Notes, the Note Purchase Agreement, the Security Agreements and the other written agreements, instruments, and documents entered into in connection therewith (collectively, the "Documents") set forth in full the terms of agreement between the parties hereto and thereto and are intended as the full, complete, and exclusive contracts governing the relationship between such parties, superseding all other discussions, promises, representations, warranties, agreements, and understandings between the parties with respect thereto. No term of the Documents may be modified or amended, nor may any rights thereunder be waived, except in a writing signed by the party against whom enforcement of the modification, amendment, or waiver is sought. Any waiver of any condition in, or breach of, any of the foregoing in a particular instance shall not operate as a waiver of other or subsequent conditions or breaches of the same or a different kind. Collateral Agent's or any Note Purchasers's exercise or failure to exercise any rights or remedies under any of the foregoing in a

(13)

17658269V I

particular instance shall not operate as a waiver of its right to exercise the same or different rights and remedies in any other instances.  There are no oral agreements among the parties hereto.

**SECTION 21.   Collateral Agent.**

The Note Purchasers hereby authorize the Collateral Agent to execute this Agreement.

**[Remainder of Page Intentionally Left Blank; Signature Pages Follow]**

(14)

IN WITNESS WHEREOF, as of the Effective Date, the duly authorized representatives of the parties have caused this Agreement to be executed and acknowledge that they have read and understood this Agreement.

### NOTE PURCHASERS:

### RITCHIE SPECIAL CREDIT INVESTMENTS, LTD.

By: Ritchie Capital Management, L.L.C., its
    Sub-Adviser

By:_____
    Name: A. R. Thane Ritchie
    Title: Chief Executive Officer

### RHONE HOLDINGS II. LTD.

By: Ritchie Capital Management, L.L.C., its
    Investment Manager

By:_____
    Name: A. R. Thane Ritchie
    Title: Chief Executive Officer

### YORKVILLE INVESTMENT I., L.L.C.

By:_____
    Name: A. R. Thane Ritchie
    Title: President

### RITCHIE CAPITAL STRUCTURE ARBITRAGE TRADING, LTD.

By: Ritchie Capital Management, L.L.C., its
    Sub-Adviser

By:_____
    Name: A. R. Thane Ritchie
    Title: Chief Executive Officer

[Extension and Amendment Agreement]

(15)

COLLATERAL AGENT:

RITCHIE CAPITAL MANAGEMENT, L.L.C.

By:_____
    Name: A. R. Thane Ritchie
    Title: Chief Executive Officer

BORROWERS:

_____
Thomas J. Petters

PETTERS GROUP WORLDWIDE, LLC

By:_____
    Name:
    Title:

PETTERS COMPANY, INC.

By:_____
    Name:
    Title:

[Extension and Amendment Agreement]

(16)

**COLLATERAL AGENT:**

**RITCHIE CAPITAL MANAGEMENT, L.L.C.**

By:_____
   Name:
   Title:

**BORROWERS:**

_____
Thomas J. Petters

**PETTERS GROUP WORLDWIDE, LLC**

By:_____
   Name:
   Title:

**PETTERS COMPANY, INC.**

By:_____
   Name:
   Title:

[Extension and Amendment Agreement]

(15)

SCHEDULE A-1 – FEBRUARY NOTES

| Note Purchaser | Date of Note | Original Principal Amount of Note | Principal Amount of Note as of August 31, 2008 | Accrued and Unpaid Interest as of August 31, 2008 | Principal Amount of Note as of 12:01 A.M. on September 1, 2008 |
|---|---|---|---|---|---|
| Ritchie Special Credit Investments, Ltd. | February 1, 2008 | $31,000,000.00 | $37,098,360.66 | $10,001,311.48 | $47,099,672.13 |
| Ritchie Special Credit Investments, Ltd. | February 4, 2008 | $31,000,000.00 | $37,166,120.22 | $9,693,738.75 | $46,859,858.97 |
| Ritchie Special Credit Investments, Ltd. | February 7, 2008 | $ 4,000,000.00 | $4,795,628.42 | $1,219,272.10 | $6,014,900.52 |
| Ritchie Special Credit Investments, Ltd. | February 19, 2008 | $ 9,000,000.00 | $10,770,491.80 | $2,478,688.52 | $13,249,180.33 |
| Rhone Holdings II, Ltd. | February 7, 2008 | $12,000,000.00 | $14,386,885.25 | $3,657,816.30 | $18,044,701.55 |
| Rhone Holdings II, Ltd. | February 19, 2008 | $16,000,000.00 | $16,000,000.00 | $737,390.71 | $16,737,390.71 |
| Yorkville Investment I, L.L.C. | February 5, 2008 | $13,000,000.00 | $15,557,377.05 | $4,057,704.92 | $19,615,081.97 |
| Yorkville Investment I, L.L.C. | February 15, 2008 | $ 5,000,000.00 | $5,994,535.52 | $1,418,980.46 | $7,413,515.98 |

A-1

## SCHEDULE A-2 - MAY NOTES

| Note Purchaser | Date of Note | Original Principal Amount of Note | Principal Amount of Note as of August 31, 2008 | Accrued and Unpaid Interest as of August 31, 2008 | Principal Amount of Note as of 12:01 A.M. on September 1, 2008 |
|---|---|---|---|---|---|
| Ritchie Capital Structure Arbitrage Trading, Ltd | May 9, 2008 | $8,000,000.00 | $9,666,666.67 | $1,991,598.17 | $11,658,264.84 |
| Yorkville Investment I., L.L.C. | May 9, 2008 | $4,000,000.00 | $4,833,333.33 | $995,799.09 | $5,829,132.42 |

A-2

## SCHEDULE B

## PC PLEDGED NOTES

1. Senior Subordinated Note in the original principal amount of $125,000,000 dated April 27, 2005, as amended and restated as of September 11, 2008, given by Polaroid Corporation in favor of Petters Capital, LLC. [UNSECURED]

2. Promissory Note in the original principal amount of $5,000,000 dated November 5, 2007, as amended and restated as of September 11, 2008, given by Polaroid Corporation in favor of Petters Capital, LLC. [SECURED]

3. Promissory Note in the original principal amount of $5,000,000 dated November 12, 2007, as amended and restated as of September 11, 2008, given by Polaroid Corporation in favor of Petters Capital, LLC. [SECURED]

# EXHIBIT A

## POLAROID SECURITY AGREEMENT

13616029 V.1

## EXHIBIT B

### THOUSAND LAKES SECURITY AGREEMENT

## EXHIBIT C

### PCI SECURITY AGREEMENT

C

**This Note has not been registered under either the Securities Act of 1933, as amended, or applicable state securities laws and may not be sold, transferred, assigned, offered, pledged or otherwise distributed for value unless there is an effective registration statement under such Act and such laws covering such Notes, or Borrower receives an opinion of counsel acceptable to it stating that such sale, transfer, assignment, offer, pledge or other distribution for value is exempt from the registration and prospectus delivery requirements of such Act and such laws.**

## PROMISSORY NOTE

$31,000,000.00                                                        February 1, 2008

   FOR VALUE RECEIVED, PETTERS GROUP WORLWIDE, LLC., a Delaware limited liability company, and Thomas J. Petters, individually (collectively, the "Borrower") promise to pay to the order of RITCHIE SPECIAL CREDIT INVESTMENTS, LTD., a Cayman Islands Exempt Company ("Lender") at 801 Warrenville Road, c/o Ritchie Capital Management, LLC, Suite 650, Lisle, Illinois 60532 or at such other place as may be designated from time to time by the holder hereof, in lawful money of the United States of America, the principal sum of THIRTY ONE MILLION AND NO/100 DOLLARS ($31,000,000.00) together with interest payable in arrears on the unpaid principal balance hereof from the date hereof until this Note is fully paid, at an annual rate of interest, calculated on the basis of actual number of days elapsed in a 365 or 366 day year (including the first day but excluding the last day). Interest on this Note shall be equal to Eighty Percent (80 %) per annum (the "Interest").

   The principal of this Note shall be due and payable on the Maturity Date (the "Maturity Date"). The initial Maturity Date shall be May, 1, 2008 (the "Initial Maturity Date"). The Initial Maturity Date shall be automatically extended for successive additional periods equal to the initial period (each, a new Maturity Date) at the prior written mutual election of the Borrower and the holder hereof; provided, however, that, in the event that the Borrower fails to make payment of all principal and Interest (including as set forth in the last sentence of this paragraph) on the Initial Maturity Date or any subsequent Maturity Date, as the case may be, in addition to declaration that all amounts are immediately due and payable hereunder, the holder hereof shall have all remedies available to lenders provided by law. All Interest shall accrue until repayment of this Note on the final Maturity Date. Payments hereunder shall be applied first to the payment of accrued interest and then to the reduction of principal. Provided at least three business days' notice is provided to Lender, the Borrower may prepay at any time and from time to time, all or any portion of the balance from time to time remaining on this Note; provided, however, in all events, a condition of prepayment shall be that Borrower shall pay that Interest that would have accrued under this Note through, to, and including the Maturity Date had no such prepayment occurred.

   This Note is guaranteed personally by Thomas J. Petters, the owner of all of the issued and outstanding stock of the Borrower; provided, however, that the parties shall endeavor, as soon as reasonably practicable, to secure this Note (along with all other Notes of this tranche, pari passu) by a pledge of 100% of the capital stock of Polaroid Holding Company, LLC and the

capital stock of its one hundred percent subsidiary the Polaroid Corporation (collectively, the "Polaroid Companies").

The Borrower agrees to pay all costs of collection, including attorneys' fees, in the event this Note is not paid when due. The undersigned shall promptly reimburse the Holder for any and all costs and expenses, including, without limitation, attorneys' fees, incurred by the Holder in connection with the enforcement of the rights of the Holder under this Note. All such costs and expenses shall constitute additional indebtedness of the undersigned to the Holder which shall be payable on demand

This Note is being delivered in, and shall be governed by, the laws of the State of Illinois and the Borrower consents to the jurisdiction of the courts in the State of Illinois for the enforcement thereof. Presentment or other demand for payment, notice of dishonor and protest are expressly waived. This Note shall not be assigned by Borrower without the prior written consent of Lender.

[SIGNATURE PAGE FOLLOWS]

PETTERS GROUP WORLDWIDE, LLC

By: _____

Its: Thomas J. Petters

_____

Thomas J. Petters, Individually

**This Note has not been registered under either the Securities Act of 1933, as amended, or applicable state securities laws and may not be sold, transferred, assigned, offered, pledged or otherwise distributed for value unless there is an effective registration statement under such Act and such laws covering such Notes, or Borrower receives an opinion of counsel acceptable to it stating that such sale, transfer, assignment, offer, pledge or other distribution for value is exempt from the registration and prospectus delivery requirements of such Act and such laws.**

## PROMISSORY NOTE

$31,000,000.00                                                              February 4, 2008

        FOR VALUE RECEIVED, PETTERS GROUP WORLDWIDE, LLC., a Delaware limited liability company, and THOMAS J. PETTERS, individually (collectively, the "Borrower") promise to pay to the order of RITCHIE SPECIAL CREDIT INVESTMENTS, LTD., a Cayman Islands Exempt Company ("Lender") at 801 Warrenville Road, c/o Ritchie Capital Management, LLC, Suite 650, Lisle, Illinois 60532 or at such other place as may be designated from time to time by the holder hereof, in lawful money of the United States of America, the principal sum of THIRTY ONE MILLION AND NO/100 DOLLARS ($31,000,000.00) together with interest payable in arrears on the unpaid principal balance hereof from the date hereof until this Note is fully paid, at an annual rate of interest, calculated on the basis of actual number of days elapsed in a 365 or 366 day year (including the first day but excluding the last day). Interest on this Note shall be equal to Eighty Percent (80%) per annum or the maximum legal rate permitted by law (the "Interest").

        The principal of this Note shall be due and payable on the Maturity Date (the "Maturity Date"). The initial Maturity Date shall be May 4, 2008 (the "Initial Maturity Date"). The Initial Maturity Date shall be automatically extended for successive additional periods equal to the initial period (each, a new Maturity Date) at the prior written mutual election of the Borrower and the holder hereof; provided, however, that, in the event that the Borrower fails to make payment of all principal and Interest (including as set forth in the last sentence of this paragraph) on the Initial Maturity Date or any subsequent Maturity Date, as the case may be, in addition to declaration that all amounts are immediately due and payable hereunder, the holder hereof shall have all remedies available to lenders provided by law. All Interest shall accrue until repayment of this Note on the final Maturity Date. Payments hereunder shall be applied first to the payment of accrued interest and then to the reduction of principal. Provided at least three business days' notice is provided to Lender, the Borrower may prepay at any time and from time to time, all or any portion of the balance from time to time remaining on this Note; provided, however, in all events, a condition of prepayment shall be that Borrower shall pay that Interest that would have accrued under this Note through, to, and including the Maturity Date had no such prepayment occurred.

This Note is guaranteed personally by Thomas J. Petters, the owner of all of the issued and outstanding stock of the Borrower; provided, however, that the parties shall endeavor, as soon as reasonably practicable, to secure this Note (along with all other Notes of this tranche, pari passu) by a pledge of 100% of the capital stock of Polaroid Holding Company, LLC and the capital stock of its one hundred percent subsidiary the Polaroid Corporation (collectively, the "Polaroid Companies").

The Borrower agrees to pay all costs of collection, including attorneys' fees, in the event this Note is not paid when due. The undersigned shall promptly reimburse the Holder for any and all costs and expenses, including, without limitation, attorneys' fees, incurred by the Holder in connection with the enforcement of the rights of the Holder under this Note. All such costs and expenses shall constitute additional indebtedness of the undersigned to the Holder which shall be payable on demand.

This Note is being delivered in, and shall be governed by, the laws of the State of Illinois and the Borrower consents to the jurisdiction of the courts in the State of Illinois for the enforcement thereof. Presentment or other demand for payment, notice of dishonor and protest are expressly waived. This Note shall not be assigned by Borrower without the prior written consent of Lender.

[SIGNATURE PAGE FOLLOWS]

2

**PETTERS GROUP WORLDWIDE, LLC**

By: _____
Its: Thomas J. Petters

_____
Thomas J. Petters, individually

3

This Note has not been registered under either the Securities Act of 1933, as amended, or applicable state securities laws and may not be sold, transferred, assigned, offered, pledged or otherwise distributed for value unless there is an effective registration statement under such Act and such laws covering such Notes, or Borrower receives an opinion of counsel acceptable to it stating that such sale, transfer, assignment, offer, pledge or other distribution for value is exempt from the registration and prospectus delivery requirements of such Act and such laws.

## PROMISSORY NOTE

$13,000,000.00                                                          February 5, 2008

FOR VALUE RECEIVED, PETTERS GROUP WORLDWIDE, LLC., a Delaware limited liability company, and THOMAS J. PETTERS, individually (collectively, the "Borrower") promise to pay to the order of YORKVILLE INVESTMENT I., L.L.C., a Delaware limited liability company ("Lender") at 801 Warrenville Road, c/o Ritchie Capital Management, LLC, Suite 650, Lisle, Illinois 60532 or at such other place as may be designated from time to time by the holder hereof, in lawful money of the United States of America, the principal sum of THIRTEEN MILLION AND NO/100 DOLLARS ($13,000,000.00) together with interest payable in arrears on the unpaid principal balance hereof from the date hereof until this Note is fully paid, at an annual rate of interest, calculated on the basis of actual number of days elapsed in a 365 or 366 day year (including the first day but excluding the last day). Interest on this Note shall be equal to Eighty Percent (80%) per annum or the maximum legal rate permitted by law (the "Interest").

The principal of this Note shall be due and payable on the Maturity Date (the "Maturity Date"). The initial Maturity Date shall be May 5, 2008 (the "Initial Maturity Date"). The Initial Maturity Date shall be automatically extended for successive additional periods equal to the initial period (each, a new Maturity Date) at the prior written mutual election of the Borrower and the holder hereof; provided, however, that, in the event that the Borrower fails to make payment of all principal and Interest (including as set forth in the last sentence of this paragraph) on the Initial Maturity Date or any subsequent Maturity Date, as the case may be, in addition to declaration that all amounts are immediately due and payable hereunder, the holder hereof shall have all remedies available to lenders provided by law. All Interest shall accrue until repayment of this Note on the final Maturity Date. Payments hereunder shall be applied first to the payment of accrued interest and then to the reduction of principal. Provided at least three business days' notice is provided to Lender, the Borrower may prepay at any time and from time to time, all or any portion of the balance from time to time remaining on this Note; provided, however, in all events, a condition of prepayment shall be that Borrower shall pay that Interest that would have accrued under this Note through, to, and including the Maturity Date had no such prepayment occurred.

This Note is guaranteed personally by Thomas J. Petters, the owner of all of the issued and outstanding stock of the Borrower; provided, however, that the parties shall endeavor, as

soon as reasonably practicable, to secure this Note (along with all other Notes of this tranche, pari passu) by a pledge of 100% of the capital stock of Polaroid Holding Company, LLC and the capital stock of its one hundred percent subsidiary the Polaroid Corporation (collectively, the "Polaroid Companies").

The Borrower agrees to pay all costs of collection, including attorneys' fees, in the event this Note is not paid when due. The undersigned shall promptly reimburse the Holder for any and all costs and expenses, including, without limitation, attorneys' fees, incurred by the Holder in connection with the enforcement of the rights of the Holder under this Note. All such costs and expenses shall constitute additional indebtedness of the undersigned to the Holder which shall be payable on demand.

This Note is being delivered in, and shall be governed by, the laws of the State of Illinois and the Borrower consents to the jurisdiction of the courts in the State of Illinois for the enforcement thereof. Presentment or other demand for payment, notice of dishonor and protest are expressly waived. This Note shall not be assigned by Borrower without the prior written consent of Lender.

[SIGNATURE PAGE FOLLOWS]

**PETTERS GROUP WORLDWIDE, LLC**

By: _____

Its:  Thomas J. Petters

_____

Thomas J. Petters, individually

This Note has not been registered under either the Securities Act of 1933, as amended, or applicable state securities laws and may not be sold, transferred, assigned, offered, pledged or otherwise distributed for value unless there is an effective registration statement under such Act and such laws covering such Notes, or Borrower receives an opinion of counsel acceptable to it stating that such sale, transfer, assignment, offer, pledge or other distribution for value is exempt from the registration and prospectus delivery requirements of such Act and such laws.

## PROMISSORY NOTE

$4,000,000.00                                                                                    February 7, 2008

FOR VALUE RECEIVED, PETTERS GROUP WORLDWIDE, LLC., a Delaware limited liability company, and THOMAS J. PETTERS, individually (collectively, the "Borrower") promise to pay to the order of RITCHIE SPECIAL CREDIT INVESTMENTS, LTD., a Cayman Islands Exempt Company ("Lender") at 801 Warrenville Road, c/o Ritchie Capital Management, LLC, Suite 650, Lisle, Illinois 60532 or at such other place as may be designated from time to time by the holder hereof, in lawful money of the United States of America, the principal sum of FOUR MILLION AND NO/100 DOLLARS ($4,000,000.00) together with interest payable in arrears on the unpaid principal balance hereof from the date hereof until this Note is fully paid, at an annual rate of interest, calculated on the basis of actual number of days elapsed in a 365 or 366 day year (including the first day but excluding the last day). Interest on this Note shall be equal to Eighty Percent (80%) per annum or the maximum legal rate permitted by law (the "Interest").

The principal of this Note shall be due and payable on the Maturity Date (the "Maturity Date"). The initial Maturity Date shall be March 8, 2008 (the "Initial Maturity Date"). The Initial Maturity Date shall be automatically extended for successive additional periods equal to the initial period (each, a new Maturity Date) at the prior written mutual election of the Borrower and the holder hereof; provided, however, that, in the event that the Borrower fails to make payment of all principal and Interest (including as set forth in the last sentence of this paragraph) on the Initial Maturity Date or any subsequent Maturity Date, as the case may be, in addition to declaration that all amounts are immediately due and payable hereunder, the holder hereof shall have all remedies available to lenders provided by law. All Interest shall accrue until repayment of this Note on the final Maturity Date. Payments hereunder shall be applied first to the payment of accrued interest and then to the reduction of principal. Provided at least three business days' notice is provided to Lender, the Borrower may prepay at any time and from time to time, all or any portion of the balance from time to time remaining on this Note; provided, however, in all events, a condition of prepayment shall be that Borrower shall pay that Interest that would have accrued under this Note through, to, and including the Maturity Date had no such prepayment occurred.

This Note is guaranteed personally by Thomas J. Petters, the owner of all of the issued and outstanding stock of the Borrower; provided, however, that the parties shall endeavor, as

soon as reasonably practicable, to secure this Note (along with all other Notes of this tranche, pari passu) by a pledge of 100% of the capital stock of Polaroid Holding Company, LLC and the capital stock of its one hundred percent subsidiary the Polaroid Corporation (collectively, the "Polaroid Companies").

The Borrower agrees to pay all costs of collection, including attorneys' fees, in the event this Note is not paid when due. The undersigned shall promptly reimburse the Holder for any and all costs and expenses, including, without limitation, attorneys' fees, incurred by the Holder in connection with the enforcement of the rights of the Holder under this Note. All such costs and expenses shall constitute additional indebtedness of the undersigned to the Holder which shall be payable on demand.

This Note is being delivered in, and shall be governed by, the laws of the State of Illinois and the Borrower consents to the jurisdiction of the courts in the State of Illinois for the enforcement thereof. Presentment or other demand for payment, notice of dishonor and protest are expressly waived. This Note shall not be assigned by Borrower without the prior written consent of Lender.

[SIGNATURE PAGE FOLLOWS]

PETTERS GROUP WORLDWIDE, LLC

By: _____
Its: Thomas J. Petters

_____
Thomas J. Petters, individually

This Note has not been registered under either the Securities Act of 1933, as amended, or applicable state securities laws and may not be sold, transferred, assigned, offered, pledged or otherwise distributed for value unless there is an effective registration statement under such Act and such laws covering such Notes, or Borrower receives an opinion of counsel acceptable to it stating that such sale, transfer, assignment, offer, pledge or other distribution for value is exempt from the registration and prospectus delivery requirements of such Act and such laws.

## PROMISSORY NOTE

$12,000,000.00                                                    February 7, 2008

FOR VALUE RECEIVED, PETTERS GROUP WORLDWIDE, LLC., a Delaware limited liability company, and THOMAS J. PETTERS, individually (collectively, the "Borrower") promise to pay to the order of RHONE HOLDINGS II. LTD, a Cayman Islands Exempt Company ("Lender") at 801 Warrenville Road, c/o Ritchie Capital Management, LLC, Suite 650, Lisle, Illinois 60532 or at such other place as may be designated from time to time by the holder hereof, in lawful money of the United States of America, the principal sum of TWELVE MILLION AND NO/100 DOLLARS ($12,000,000.00) together with interest payable in arrears on the unpaid principal balance hereof from the date hereof until this Note is fully paid, at an annual rate of interest, calculated on the basis of actual number of days elapsed in a 365 or 366 day year (including the first day but excluding the last day). Interest on this Note shall be equal to Eighty Percent (80%) per annum or the maximum legal rate permitted by law (the "Interest").

The principal of this Note shall be due and payable on the Maturity Date (the "Maturity Date"). The initial Maturity Date shall be March 8, 2008 (the "Initial Maturity Date"). The Initial Maturity Date shall be automatically extended for successive additional periods equal to the initial period (each, a new Maturity Date) at the prior written mutual election of the Borrower and the holder hereof; provided, however, that, in the event that the Borrower fails to make payment of all principal and Interest (including as set forth in the last sentence of this paragraph) on the Initial Maturity Date or any subsequent Maturity Date, as the case may be, in addition to declaration that all amounts are immediately due and payable hereunder, the holder hereof shall have all remedies available to lenders provided by law. All Interest shall accrue until repayment of this Note on the final Maturity Date. Payments hereunder shall be applied first to the payment of accrued interest and then to the reduction of principal. Provided at least three business days' notice is provided to Lender, the Borrower may prepay at any time and from time to time, all or any portion of the balance from time to time remaining on this Note; provided, however, in all events, a condition of prepayment shall be that Borrower shall pay that Interest that would have accrued under this Note through, to, and including the Maturity Date had no such prepayment occurred.

This Note is guaranteed personally by Thomas J. Petters, the owner of all of the issued and outstanding stock of the Borrower; provided, however, that the parties shall endeavor, as

soon as reasonably practicable, to secure this Note (along with all other Notes of this tranche, pari passu) by a pledge of 100% of the capital stock of Polaroid Holding Company, LLC and the capital stock of its one hundred percent subsidiary the Polaroid Corporation (collectively, the "Polaroid Companies").

The Borrower agrees to pay all costs of collection, including attorneys' fees, in the event this Note is not paid when due. The undersigned shall promptly reimburse the Holder for any and all costs and expenses, including, without limitation, attorneys' fees, incurred by the Holder in connection with the enforcement of the rights of the Holder under this Note. All such costs and expenses shall constitute additional indebtedness of the undersigned to the Holder which shall be payable on demand.

This Note is being delivered in, and shall be governed by, the laws of the State of Illinois and the Borrower consents to the jurisdiction of the courts in the State of Illinois for the enforcement thereof. Presentment or other demand for payment, notice of dishonor and protest are expressly waived. This Note shall not be assigned by Borrower without the prior written consent of Lender.

[SIGNATURE PAGE FOLLOWS]

PETTERS GROUP WORLDWIDE, LLC

By: _____
Its: Thomas J. Petters

_____
Thomas J. Petters, individually

This Note has not been registered under either the Securities Act of 1933, as amended, or applicable state securities laws and may not be sold, transferred, assigned, offered, pledged or otherwise distributed for value unless there is an effective registration statement under such Act and such laws covering such Notes, or Borrower receives an opinion of counsel acceptable to it stating that such sale, transfer, assignment, offer, pledge or other distribution for value is exempt from the registration and prospectus delivery requirements of such Act and such laws.

## PROMISSORY NOTE

$5,000,000.00                                                                              February 15, 2008

FOR VALUE RECEIVED, PETTERS GROUP WORLDWIDE, LLC., a Delaware limited liability company, and THOMAS J. PETTERS, individually (collectively, the "Borrower") promise to pay to the order of YORKVILLE INVESTMENT I, L.L.C., a Delaware limited liability company ("Lender") at 801 Warrenville Road, c/o Ritchie Capital Management, LLC, Suite 650, Lisle, Illinois 60532 or at such other place as may be designated from time to time by the holder hereof, in lawful money of the United States of America, the principal sum of FIVE MILLION AND NO/100 DOLLARS ($5,000,000.00) together with interest payable in arrears on the unpaid principal balance hereof from the date hereof until this Note is fully paid, at an annual rate of interest, calculated on the basis of actual number of days elapsed in a 365 or 366 day year (including the first day but excluding the last day). Interest on this Note shall be equal to Eighty Percent (80%) per annum or the maximum legal rate permitted by law (the "Interest").

The principal of this Note shall be due and payable on the Maturity Date (the "Maturity Date"). The initial Maturity Date shall be March 16, 2008 (the "Initial Maturity Date"). The Initial Maturity Date shall be automatically extended for successive additional periods equal to the initial period (each, a new Maturity Date) at the prior written mutual election of the Borrower and the holder hereof; provided, however, that, in the event that the Borrower fails to make payment of all principal and Interest (including as set forth in the last sentence of this paragraph) on the Initial Maturity Date or any subsequent Maturity Date, as the case may be, in addition to declaration that all amounts are immediately due and payable hereunder, the holder hereof shall have all remedies available to lenders provided by law. All Interest shall accrue until repayment of this Note on the final Maturity Date. Payments hereunder shall be applied first to the payment of accrued interest and then to the reduction of principal. Provided at least three business days' notice is provided to Lender, the Borrower may prepay at any time and from time to time, all or any portion of the balance from time to time remaining on this Note; provided, however, in all events, a condition of prepayment shall be that Borrower shall pay that Interest that would have accrued under this Note through, to, and including the Maturity Date had no such prepayment occurred.

This Note is guaranteed personally by Thomas J. Petters, the owner of all of the issued and outstanding stock of the Borrower; provided, however, that the parties shall endeavor, as

soon as reasonably practicable, to secure this Note (along with all other Notes of this tranche, pari passu) by a pledge of 100% of the capital stock of Polaroid Holding Company, LLC and the capital stock of its one hundred percent subsidiary the Polaroid Corporation (collectively, the "Polaroid Companies").

The Borrower agrees to pay all costs of collection, including attorneys' fees, in the event this Note is not paid when due. The undersigned shall promptly reimburse the Holder for any and all costs and expenses, including, without limitation, attorneys' fees, incurred by the Holder in connection with the enforcement of the rights of the Holder under this Note. All such costs and expenses shall constitute additional indebtedness of the undersigned to the Holder which shall be payable on demand.

This Note is being delivered in, and shall be governed by, the laws of the State of Illinois and the Borrower consents to the jurisdiction of the courts in the State of Illinois for the enforcement thereof. Presentment or other demand for payment, notice of dishonor and protest are expressly waived. This Note shall not be assigned by Borrower without the prior written consent of Lender.

[SIGNATURE PAGE FOLLOWS]

PETTERS GROUP WORLDWIDE, LLC

By: _____
Its:  Thomas J. Petters

_____
Thomas J. Petters, individually