IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

--------------------------------------------------------------
```
                                   )
UNITED STATES OF AMERICA,          )   CIVIL ACTION
                                   )   NO. 08-5348
                    Plaintiff,     )
           vs.                     )    (ADM/JSM)
                                   )
(1) THOMAS JOSEPH PETTERS;         )
    PETTERS COMPANY, INC., a/k/a   )
    PCI; PETTERS GROUP WORLDWIDE, LLC; )
(2) DEANNA COLEMAN, a/k/a DEANNA MUNSON; )
(3) ROBERT WHITE;                  )
(4) JAMES WEHMHOFF;                )
(5) LARRY REYNOLDS, and/or d/b/a   )
    NATIONWIDE INTERNATIONAL RESOURCES, )
    a/k/a NIR;                     )
(6) MICHAEL CATAIN, and/or d/b/a   )
    ENCHANTED FAMILY BUYING COMPANY; )
(7) FRANK E. VENNES, JR., and/or d/b/a )
    METRO GEM FINANCE,             )
    METRO GEM, INC.,               )
    GRACE OFFERINGS OF FLORIDA, LLC, )
    METRO PROPERTY FINANCING, LLC, )
    38 E. ROBINSON, LLC,           )
    55 E. PINE, LLC,               )
    ORLANDO RENTAL POOL, LLC,      )
    100 PINE STREET PROPERTY, LLC, )
    ORANGE STREET TOWER, LLC,      )
    CORNERSTONE RENTAL POOL, LLC,  )
    2 SOUTH ORANGE AVENUE, LLC,    )
    HOPE COMMONS, LLC,             )
    METRO GOLD, INC.,              )
                    Defendants,    )
                                   )
DOUGLAS A. KELLEY,                 ) Courtroom 13 West
                    Receiver,      )       Friday
GARY HANSEN,                       ) April 17, 2009
                    Receiver.      ) Minneapolis, MN
                                   )
```
--------------------------------------------------------------

**HEARING ON RITCHIE CAPITAL MANAGEMENT'S
MOTION TO INTERVENE**

**[ DOCKET NO. 225 ]**

BEFORE THE HONORABLE ANN D. MONTGOMERY
UNITED STATES DISTRICT JUDGE

**A P P E A R A N C E S :**


For the **Government:**          **OFFICE OF THE U.S. ATTORNEY**
                                 By:  GREGORY G. BROOKER
                                      ROBYN A. MILLENACKER
                                      JOSEPH T. DIXON, III
                                      DAVID FULLER
                                      Assistant U.S. Attorneys
                                 600 United States Courthouse
                                 300 South Fourth Street
                                 Minneapolis, Minnesota  55415


For receiver
 **Douglas A. Kelley:**          **LINDQUIST & VENNUM, PLLP**
                                 By:  TERRENCE J. FLEMING, ESQUIRE
                                 4200 IDS Center
                                 80 South Eighth Street
                                 Minneapolis, Minnesota  55402


For petitioners
 **Ritchie Special Credit Investments, Ltd., Rhone
  Holdings II, Ltd., Yorkville Investment I, LLC,
   Ritchie Capital Structure Arbitrage Trading, Ltd.,
    and Ritchie Capital Management, LLC:**


                                 **KELLY & BERENS, P.A.**
                                 By:  TIMOTHY D. KELLY, ESQUIRE
                                      JENNIFER S. WILSON, ESQUIRE
                                 3720 IDS Center
                                 80 South Eighth Street
                                 Minneapolis, Minnesota  55402

                                 BRENDA GRANTLAND, ESQUIRE
                                 (*pro hac vice* admission pending)
                                 20 Sunnyside Suite A-204
                                 Mill Valley, California  94941


          **TIMOTHY J. WILLETTE, RDR, CRR, CBC, CCP**
          Official Court Reporter – United States District Court
                     1005 United States Courthouse
                       300 South Fourth Street
                     Minneapolis, Minnesota  55415
                           612.664.5108

```
1        (9:00 a.m.)

2                    P R O C E E D I N G S

3                     IN OPEN COURT

4        THE COURT:   Good morning.  Please be seated.

5        THE CLERK:   This matter is in the case of United

6   States vs. Petters, et al., Number 08-5348.

7        THE COURT:   Let's note appearances.  We'll start

8   over here at the Government table.

9        Ms. Millenacker?

10       MS. MILLENACKER:   Good morning, your Honor.  Robyn

11  Millenacker, Greg Brooker, David Fuller, and Joe Dixon for

12  the United States.

13       THE COURT:   Good morning.

14       Back table?  Mr. Fleming?

15       MR. FLEMING:   Good morning, your Honor.  Terry

16  Fleming representing the receiver Doug Kelley.

17       THE COURT:   Mr. Kelly, Mr. Tim Kelly.

18       MR. KELLY:   And I'm known as Tim Kelly, the law

19  firm of Kelly & Berens, and we represent the Ritchie Group.

20  With me is Jennifer Wilson from Kelly & Berens, and also in

21  the back of the room -- stand up, please, Brenda -- is Brenda

22  Grantland, who is admitted *pro hac*.

23       THE COURT:   Good morning.

24       MS. GRANTLAND:   Good morning.

25       THE COURT:   The matter before the Court is, of
```

1  course, the motion of the Ritchie Group to intervene and to

2  vacate the restraining order as it relates to Petters Group

3  Worldwide, or PGW.

4            And, Mr. Kelly, I'll hear you in support of your

5  motion.

6            MR. KELLY:   Thank you, your Honor.  I know you

7  read the papers and so I'll endeavor not to repeat what's in

8  the papers.  Let me first turn to the motion to intervene.

9            Our basic point is that Rule 24 does not bar

10  efforts by a secured creditor of a person whose assets are

11  restrained by an overly broad Section 1345 order to seek to

12  vacate that order.  Let me first turn to the elements of

13  Rule 24.

14            There's three elements and the first one is an

15  interest in the property at issue in the case, and we claim

16  we have an interest in the property that's restrained because

17  we have notes and security interests that are legally binding

18  from PGW and from Polaroid and from Petters Capital, LLC.

19  And the Government says, "Not so fast.  That's really not

20  true.  What you did is, you lent money to PCI and you papered

21  it as a loan to PGW."

22            The evidence that the Government cites in support

23  of that is that certain of the funds were wired to PCI

24  accounts, and that's the only evidence, really, that the

25  Government cites for that proposition.

1          Our response is no, no.  This isn't -- you don't

2     understand how business deals like this work.  You work out

3     the terms between borrower and lender, you enter into legally

4     binding agreements, then you get wire instructions, and the

5     wire instructions here were merely for administrative

6     convenience.  They cannot be taken to destroy the validity of

7     these legally binding notes.

8          I don't think I should have to comment on that

9     theory because I think the rules of the road under Rule 24 is

10    you take the assertion of the movant as stated as *prima facie*

11    and you don't go behind it; otherwise, you end up with little

12    trials and trials, but let me do comment on it just very

13    briefly.

14         The Government's theory that we lent money to PCI

15    and just papered it with notes from PGW makes absolutely no

16    sense.  Just imagine for a minute if it was true.  If it was

17    true, we would have advanced over a hundred million dollars

18    to PCI without a note in return and without any collateral.

19    All we would have taken is worthless paper from PGW.  You

20    know, we're not idiots.  You can't assume that such a thesis

21    makes any sense.

22         THE COURT:  Before we drill down too deep on some

23    of the points you raise, I guess I'm having trouble with the

24    broader view of the case.

25         Given everything you request, assume you intervene

1   and I declare the receivership void *ab initio* issue, where

2   does that leave us?  I mean, it seems to me that Polaroid,

3   who's the real entity you're interested in --

4              MR. KELLY:   Right.

5              THE COURT:   -- is in bankruptcy and has been for

6   some period of time.  As we all know, there have been a

7   series of events there.  What are you really asking to unwind

8   here?

9              MR. KELLY:   I think the question is what happens

10  next and here's the way I see it.

11             If you were to enter an order declaring the PGW

12  aspect of your existing orders to be void, I think at that

13  point there would no longer be a receiver for PGW entities

14  that are no longer in -- that are not in bankruptcy.  As to

15  the PGW entities that are in bankruptcy, however, they would

16  stay in bankruptcy and we would -- you know, in fairness we

17  would move to try to terminate those bankruptcies, but your

18  order would not automatically terminate those bankruptcies.

19             It seems to me, your Honor, as a practical matter

20  -- and I appreciate your focusing in on the relief, because

21  it makes sense to me too -- I think you got a couple of

22  choices here.

23             One is, if you think I'm right, then I think you

24  ought to enter a vacation order as to PGW and the PGW

25  entities and stay it 30 days and give the parties an

1    opportunity to work something out.

2            An alternative -- because really, my pitch here

3    today is you can't pay any attention to paragraph 6, 7 and 8

4    of the Kelley affidavit.  If anything ever offended the

5    Federal Rules of Evidence, it's paragraphs 6, 7 and 8 of his

6    affidavit, and if you accept that from him, then equal

7    justice under law doesn't exist, because you never would

8    accept it from me in any other civil case.  You can't do

9    that.

10           So another alternative for you is to issue an

11   order, doing the analysis and saying Ritchie is right.  The

12   PGW assets ought not have been restrained.  I am, however,

13   going to issue an order to show cause requiring the

14   Government to come forth with the proper grounds for

15   restraint of those assets, the facts, not Kelley's

16   conclusion, "Somebody told me," or, "Some expert told me."

17   Come forth with the facts and give us a little discovery.  I

18   think that's the proper way to handle --

19           THE COURT:  But you really don't object, as I

20   understand it, to a receivership being in place.  I mean,

21   your client asked to appoint a receiver, albeit a different

22   one, from the beginning and your papers say you understand it

23   was a rudderless ship and something had to be put in place

24   immediately.

25           MR. KELLY:  Sure.  I think the notion --

1   ultimately, do the nonbankrupt entities who are not in

2   bankruptcy have to have a receiver?  Yes, they have to have a

3   receiver.  This receiver appointed pursuant to this order is

4   improper.  You got to play by the rules on 1345 is my

5   basic --

6          THE COURT:  Okay.  Well, let's go to 1345 and tell

7   me what you think was deficient about that.  I'm troubled by

8   the -- at least the original brief here seemed to take the

9   position that PGW was charged with money laundering only, and

10  I think any reading of the indictment indicates that there's

11  also a defendant to mail fraud and wire fraud.

12         MR. KELLY:  Oh, absolutely, but I still stand by

13  my reading in terms of the way you use the indictment for

14  purposes of 1345.  There's no question that PGW is charged

15  with a series of crimes, but your job in a 1345 proceeding is

16  to drill down and look at the specific transactions and the

17  nature of those specific transactions, and when you look at

18  the 20 specific transactions in the indictment, only one of

19  them mentions PGW and it is not in the context of PGW doing

20  anything wrong.  PGW is not even named in that particular

21  count, that Count 20.  You're sitting here as a civil court.

22         If you look at the appellate cases that have dealt

23  with 1345 and similar restraints, like **Jones** and **Cohen** and

24  **Fields** and **Reilly**, there's two problems, I think, that those

25  judges are having with these overly broad 1345 restraints.

1    One is inadequacy of fact findings.  There's a lot of

2    stipulations done between the Government and Mr. Civil

3    Defendant who also happens to be Mr. Criminal Defendant.  And

4    they're broadly stated, they don't have factual basis, and

5    when they get to the courts of appeals, the courts of appeals

6    say:  We're not going to accept them, because for the civil

7    side of this case they're inadequate.  They're not the types

8    of fact findings you're going to find on other preliminary

9    injunctions.  And I understand why that happens.  It happens

10   because there's these tandem efforts by the Government on the

11   one hand to prosecute the defendant and on the other hand to

12   restrain before there's a conviction.  But the courts of

13   appeals are not accepting 1345 orders that don't have proper

14   "t" crossing and "i" dotting where they've affected third

15   parties.

16        The second problem with the 1345 orders is that

17   they've -- is the notion of due process.  And you read those

18   cases like **Fields** and **Reilly,** and the concern is this is a

19   prejudgment attachment.  You know, this is something that

20   we're not going to allow unless we're certain the facts

21   exist.  I'll put it another way, your Honor.

22        The Government and Petters perhaps could have

23   stipulated to facts that would give rise to a righteous 1345

24   injunction.  They did not do so.  They did not do so.  And

25   under the circumstances here we have a defective 1345

1   injunction as to PGW and that defect has got to be cured.  It

2   just can't be pushed under the rug.

3          The last thing you see in those cases is a

4   fundamental notion that expediency can't trump due process.

5   Expediency can't trump honoring the statute.  You'll see some

6   district court cases that kind of go the other way.  They

7   kind of say, well, expediency trumps everything.  You know,

8   we can't let something bad happen.  But all the court of

9   appeals cases basically say we're not going to let that

10  happen because of due process.

11         I do want to make a point about the intervention

12  which is not made in the motion papers, and that is the

13  absence of any affidavit from Mary Jeffries.  I mean, you

14  know who I'm talking about, your Honor, used to be the COO of

15  PGW, now the CEO of Polaroid, very close to Petters when he

16  was running the show.  Now she works for Kelley, hasn't been

17  charged --

18         THE COURT:  She signed the bankruptcy petition.

19  She's effectively the person that put Polaroid into

20  bankruptcy.

21         MR. KELLY:  Right, right.  But we also supplied

22  you with information that she was on the scene for the

23  Petters loans, she participated in the Petters loans, and so

24  there should have been an affidavit from Mary Jeffries

25  saying:  "Hey, look, the Petters loans were really to PCI.  I

1    was part of the transaction."  The absence of that affidavit,

2    it strikes me, leads to a clear inference, an absolutely

3    clear inference that the Government's theory about us not

4    having an interest is nonsense.

5            I want to make another point about the

6    intervention.  You allowed Acorn to intervene and that was

7    the right thing to do.  We want us to be treated the same.  I

8    think we got the same issue --

9            THE COURT:  You're not seeking permissive

10   intervention, though, correct?

11           MR. KELLY:  We're seeking intervention as a matter

12   of right.  If you want to give us permissive intervention,

13   God bless you.

14           (Laughter)

15           MR. KELLY:  And we want to be treated the same as

16   Acorn.  I think we have the same situation as Acorn.  They

17   were saying the issue there was the scope of the stay order.

18   Here we're raising --

19           THE COURT:  They had some active litigation

20   ongoing that is sort of ancillary to these proceedings.  I

21   think it was a little different.

22           MR. KELLY:  Well, is it a meaningful difference?

23   It doesn't seem to me it's a meaningful difference, you know.

24   You know, the fact of the matter here is Kelley has active

25   litigation going on against us.  I mean, when you denied our

1    motion the last time around to intervene, what you said is

2    Kelley can adequately protect your interests, okay, and I

3    want to take issue with that, your Honor.  I mean, that was

4    then, this is now.  Now Kelley's suing us.  He's suing us to

5    bust our liens.  He's suing us to turn our debt into equity.

6    The only other lawsuit he's brought, the only other avoidance

7    action he's brought is against Acorn, who's got some similar

8    situation to us.

9         My point here is he is absolutely adverse to us and

10   he can't be anything other than adverse to us.  What does

11   Kelley want?  What does Doug Kelley want at the end of these

12   proceedings?  He wants a successful receivership, right?

13   What is a successful receivership?  A successful receivership

14   is a situation where the victims get money, where the victims

15   get paid, and the more money, the better.  An unsuccessful

16   receivership is a situation where Kelley collects ten or

17   $15 million, he spends it all on lawyers and accountants and

18   investment bankers, and the victims get nothing.  He puts a

19   feather in his cap by having a successful receivership and

20   there is only one way he can do that, and that is bust our

21   liens and take the Polaroid proceeds and distribute it among

22   the victims.  So you can't say today that Kelley could

23   adequately represent our interests.

24        The last point I want to make on the intervention

25   is -- and I averted to it a little bit.  1345 is an odd duck.

1    It's not like other injunctions.  You got the Government on

2    the one hand turning to Mr. -- cutting some sort of a deal

3    with Mr. Civil Defendant to restrain assets, maybe to appoint

4    a receiver, all under the shadow of the criminal indictment

5    or the criminal charge, and so I say Rule 24 needs to be

6    liberally applied in terms of those types of 1345 orders.  In

7    other words, you have to allow people like us to come in or

8    else we skate over the edge of due process here.  Let me

9    explain it to you this way:

10         Let's say I went down on the Nicollet Mall and I

11   grabbed a passerby and I said, "Let me tell you what happened

12   to somebody I know over in Timbuktuistan.  This guy had a

13   business.  One of his employees went to the Government and

14   said the business is a big fraud.  Here's what the Government

15   did:  They arrested him, put him behind bars.  He hasn't seen

16   the light of day for the last six months.  They took all of

17   his property away and now they're liquidating all of that

18   property.  They also got a court to enter an order that his

19   secured creditors who have interest in that property can't

20   sue.  They can't even go to a court to seek their rights.

21   And the Government hasn't proved any of these charges and

22   hasn't had a trial yet."

23         The average person would say in response to such a

24   story, "Thank God that can't happen in the United States of

25   America."

         1          The point I'm trying to make is, 1345 is right at

         2     the edge of due process and what would save it from a due

         3     process violation is people like Ritchie, who are adversely

         4     affected, can come into the court that issued the order and

         5     say, "Wait a minute.  It's overly broad."  Because the

         6     criminal defendant isn't going to say it's overly broad, and

         7     even if he wants to say it, he's got to keep an eye on his

         8     rights as a criminal defendant and he may not want to submit

         9     facts that could damage him in the criminal proceeding.

        10          THE COURT:  But your Timbuktu hypothetical doesn't

        11     include a bankruptcy court and a set of remedies within

        12     bankruptcy court, and doesn't Ritchie have that?

        13          MR. KELLY:  The bankruptcy court's running scared

        14     because of the nature of the order here, number one, and

        15     number two, it still doesn't mean that the 1345 order ought

        16     not be a proper 1345 order.  You got to cross your t's and

        17     dot your i's here.

        18          THE COURT:  What about the fact that it is in

        19     bankruptcy?  Should there have been a motion first to lift

        20     the automatic stay before you came here?  I mean, it seems to

        21     me that it is an action to seek control over property of the

        22     bankruptcy estate.

        23          MR. KELLY:  You know, I'm not an expert in that

        24     area, your Honor.  This is the first time I heard of that

        25     and I'm not able to respond.  You ought to give me some time

1   to respond on something like that.  But again, do you really

2   want to do that?  Do you really want to create barriers and

3   say creditors can't come in here when there's an overly broad

4   order?  Is that the way this statute's going to work?

5               THE COURT:   Okay.  I hear you.

6               MR. KELLY:   Let me turn to the motion to vacate.

7               Again, I gave you the preliminaries.  I think the

8   courts of appeals are concerned about general statements

9   versus specific facts.  I think they're concerned about the

10  notion of expediency trumping due process.

11              When you get a preliminary injunction packet, you

12  know, it's like the packet you got on your desk right now.

13  Suddenly it appears in your chambers, big stack of documents,

14  and somebody says, "I got to have an injunction an hour from

15  now or the world is going to end," yada, yada.  You know the

16  drill.  And I think the experienced judges take that stack,

17  big stack, and divide it into two things.  One is the lawyer

18  rhetoric, the complaint and the memo, et cetera, and the

19  other stack is the evidence.  It's the facts.  And they, you

20  know, glance at the lawyer stuff to get an idea of what laws

21  are at issue and then they hone in on the facts, and that's

22  what you need to do here as to this motion.  You know, what

23  is the little stack here?  The big stack's always the lawyer

24  rhetoric.  The little stack's always the facts.

25              The little stack here is mighty little.  The little

1    stack here consists of the Rice affidavit, the Kelley

2    affidavit we just got, the April 13 Kelley affidavit, the

3    stipulation and the indictment.  Let me take them in reverse

4    order.

5           The indictment.  I don't think it's evidentiary.  I

6    couldn't find a case where it was purported to be

7    evidentiary.  It is --

8           THE COURT:  There's been some due process, though.

9    There's been a grand jury that's reviewed it and determined

10   probable cause.

11          MR. KELLY:  The only difference between the

12   indictment and a complaint that some lawyer dreamed up is

13   that the grand jury has approved it, which is not

14   insignificant, but I don't think it satisfies the burden of

15   preponderance of evidence and I think that that is the proper

16   burden.  Whatever else you do here, that is the proper

17   burden.  That's the better law on 1345.

18          I'm going to mention the indictment a little bit

19   later because I think it does favor us in one respect.

20          The second thing is the stipulation.  You can't

21   give that any weight.  That is a negotiated agreement between

22   the Government and the civil defendant with the criminal

23   charges hanging over his shoulder.  And moreover, it doesn't

24   satisfy the 1345 requirements, and it isn't an admission.

25   There's no admission in there that Petters acquired Polaroid

1   with the proceeds of fraud by PCI.  He wasn't going to say

2   that.

3           Which brings me to the April 13, 2009 Kelley

4   affidavit.  Paragraphs 6, 7 and 8, all blatant hearsay, and 7

5   and 8 are expert hearsay, they're "The experts told me," and

6   you just -- you can't put any weight on it.  It doesn't have

7   foundation, it's got no details, nothing inherently plausible

8   about any of it.

9           As I said earlier, if you accept this from Kelley,

10  then it's a double standard.  Then the Government's getting a

11  form of evidentiary relief in a very important civil order

12  affecting third parties that nobody else would get in this

13  courtroom.  If I walked into your courtroom in a simple

14  noncompete case saying, "I'm the old employer.  I want you to

15  enforce the noncompete.  I want you to order this person not

16  to work for the new employer.  I want you to prevent him from

17  earning a living, feeding his family," pretty serious stuff,

18  and I gave you an affidavit like Mr. Kelley's affidavit,

19  you'd give me the gimlet eye and you'd say, "No, no.  I want

20  affidavits from people with the facts here."

21          Which brings me to the Rice affidavit.  We agree

22  that that is properly before the Court and when you strip

23  away everything, the Rice affidavit is the basis for this

24  entire enterprise that has been going on for the last six

25  months, not a word about PGW until you get to the very end

1    where they're talking about some people.  34-A has got a

2    reference -- I think it's a typo.  You read it.  I'm pretty

3    sure it's a typo.  34-B and 37-E and J also refer to PGW, but

4    not in the sense of doing anything wrong.  There's 50

5    references to PCI in 40 paragraphs in the Rice affidavit,

6    massive allegations of fraud.  The fraud is detailed,

7    explained in great care and nothing about PGW doing anything

8    wrong.  So I say the Rice affidavit is exculpatory, not

9    inculpatory, as to PGW.

10            THE COURT:  Well, is it really?  It might be

11   neutral.  How would it be exculpatory?  Does it say --

12            MR. KELLY:  No, no.  Because Rice went to all this

13   trouble, and if PGW had been involved in the way that they're

14   suggesting now, she'd have said something to that effect.

15   You know, it's the same reason he hasn't fired Jeffries.  Why

16   hasn't Kelley fired Jeffries?  You know, "You ran PGW, this

17   terrible criminal enterprise.  You ought be charged with a

18   crime too."  Instead, Jeffries is still hanging on.  You

19   know, it strikes me as very exculpatory.

20            I do want to talk about one -- the final point I'm

21   going to make has to do with the Government's contention that

22   this Kelly didn't read the statute right, and it has to do

23   with the authority.

24            THE COURT:  Good Kelly.

25            MR. KELLY:  What?

1          THE COURT:   Good Kelly, as opposed --

2          MR. KELLY:   The Kelly who knows how to spell his

3    name properly.

4          (Laughter)

5          MR. KELLY:   And here's the -- this is the

6    property-of-equivalent-value argument under 1345(a)(2)(B)(i).

7          The Government says, "Look, Tim Kelly.  You know,

8    you've made this big pitch that we didn't show that Polaroid

9    and PGW were involved in the fraud or the proceeds were

10   traceable into those entities, but you didn't read the

11   statute.  You didn't see that there is a provision in the

12   statute that says we get to hook -- the Government gets to

13   hook property of equivalent value."

14          And my response is, "Well, excuse me, but you

15   didn't say in the complaint that you were trying to hook

16   property of equivalent value.  You didn't ask Judge

17   Montgomery in your stipulation to find that you were hooking

18   property of equivalent value.  So, you know, I'm sorry that I

19   didn't do what you suggest I ought to do, but I'm willing to

20   do it now."

21          So let's take a look at 1345(a)(2) and see what the

22   breadth of that is.

23          1345(a)(2) applies only to property obtained as a

24   result of a banking law violation or a federal health care

25   offense.  I think we all agree there's no federal health care

1    offense, okay?  So, do we have a banking law violation?  And

2    1345(a)(2) says you got to look at 18 U.S.C. Section 3322(d)

3    as to what constitutes a banking law violation, and it says

4    two things:  Either Section 1344, bank fraud -- go back to

5    the indictment, look through the indictment, no allegation of

6    bank fraud -- or Section 1341, mail fraud, or 1343, wire

7    fraud, quote, affecting a financial institution, affecting a

8    financial institution.

9         Now, it's important that there's no adverse effect

10   on a financial institution pleaded here, but in fairness to

11   the Government, it has a pleading that the wrongdoing by

12   Petters did affect a financial institution, and that is found

13   in paragraph 10 of the second amended complaint.  It was

14   found in the earlier complaints as well.  Please look at that

15   section, or that paragraph, and it says this wrongdoing

16   affected a financial institution, but it does not say that a

17   financial institution was harmed.  It does not say that a

18   financial institution was victimized.  It says that the

19   financial institution was simply used as a conduit.

20        THE COURT:  So if they'd inserted "adversely

21   affected," that would have satisfied it?

22        MR. KELLY:  Hang on.  That's exactly the problem,

23   your Honor.  What the courts of appeals tell us is you can't

24   just incant sections of the Code and ask for conclusions, you

25   got to come up with hard facts, and the Government tries to

1    do that in paragraph 10.  They refer you to paragraphs 31 to

2    35 of the Rice affidavit and I ask you to read those

3    paragraphs, and it talks about two financial institutions

4    where people other than Petters misled the financial

5    institutions, didn't tell them that their bank accounts were

6    being used as conduits.

7           There is no case where affecting a financial

8    institution has been found to exist if the allegation of the

9    effect on the financial institution is merely as a conduit,

10   and let me give you a case which you ought to read, **United**

11   **States vs. Grass**, 274 F.Supp.2d 648, lengthy discussion at

12   653 to 654.  It has a long cite of courts of appeals cases

13   where they say affecting a financial institution means

14   adversely affecting a financial institution.  It means

15   victimizing a financial institution.  And there are a lot of

16   circumstances where harm to the financial institution could

17   arise even if the financial institution itself is not the

18   victim of the fraud.  But it specifically says just being a

19   mere conduit isn't enough and it cautions the reader that

20   those words, "affecting" or "affected a financial

21   institution" occur at various points throughout the United

22   States Code, and if you're going to expand it to "conduit,"

23   it's going to have a lot of ramifications in a lot of other

24   cases.

25           So to the extent -- the bottom line here, your

1    Honor, is the Government says look at Doug Kelley's

2    affidavit.  That'll shore up this hole about traceable --

3    proceeds were traceable into the -- proceeds of PCI's

4    wrongdoing were traceable into PGW.  I'm saying you can't

5    look at that affidavit.  That's improper.

6         To the extent they're saying alternatively how

7    about the property of equivalent value, then you got to look

8    at (a)(2).  Then you got to look at whether there's a

9    financial institution allegedly involved in a way that would

10   trigger (a)(2), and you don't have that here.

11        I will leave you with one question, a rhetorical

12   question -- I don't want you to answer, I want you to think

13   about it -- and that question is:  Are you comfortable with

14   what's going on here?

15        Thank you, your Honor.

16        THE COURT:  All right.  I have one question for

17   you before you depart and that is not a rhetorical one.

18        I'm interested in why now.  I understand that you

19   brought an earlier motion and then lots has happened since

20   then, including a number of proceedings in Bankruptcy Court

21   to which you have been a participant in some form, and now as

22   we're down the road a ways you come in say that the 1345

23   order is invalid *ab initio*, so I guess I want a little

24   explanation from you as to the timing of this motion.

25        MR. KELLY:  Right.  You know, the Ritchie folks

1    came to you right at the start and said:  We think some

2    things here are going wrong.  We think they ought to be done

3    a different way, and you entered --

4              THE COURT:  Well, "Appoint our receiver" is --

5              MR. KELLY:  Pretty much, yeah, "Do it our way."

6    And you entered a brief order saying:  You know, I don't

7    think these allegations have any merit and I'm going to deny

8    intervention because the Ritchie interests can be adequately

9    protected by the receiver, and we went and tried to work with

10   that.  We tried to work with the receiver and get him to

11   protect our interests.  And it became utterly apparent to us

12   as I told you, you know, a while ago that, you know, Kelley's

13   a dutiful guy.  You know, he's a mensch and he wants to have

14   a successful receivership, and the only way he can have that

15   successful receivership is defeating our interests.  And, you

16   know, we didn't want to be in a position -- I wish we'd have

17   brought this a month ago, frankly, but we didn't want to be

18   in a position where you're saying, "Geez, Tim Kelly, why

19   don't you go back to the Bankruptcy Court and raise your

20   concerns and they can take care of you?"  You know, the

21   genesis of this is your order, and it isn't you, your Honor.

22   It's what the Government and Petters gave you.

23             And so, you know, that's the history of why we

24   didn't.  I mean, we looked at what the Court said and -- and

25   I think three or four weeks after you entered that order I

1    sent a letter to Doug Kelley saying:  "You got a conflict of

2    interest here and you got to deal with that," and I never got

3    a response.  It's in the Government's papers.

4              THE COURT:  But you raised that to the Bankruptcy

5    Court at the time of the trustee designation.

6              MR. KELLY:  Yeah, we did, and the Government --

7    you're asking me, "Tim Kelly, aren't you too late?" and the

8    Bankruptcy Court's saying, "Ritchie, you're too early," and

9    so --

10             THE COURT:  All right.

11             MR. KELLY:  Thank you.

12             THE COURT:  There's no pleasing us, I guess.

13             All right.  Ms. Millenacker, I'll hear from you

14   with regard to the Government's position.

15             MS. MILLENACKER:  Good morning, your Honor.

16             I'm going to be addressing the parts of the

17   response dealing with the intervention and the bankruptcy,

18   and then I'm going to turn it over to Mr. Fuller to deal with

19   the aspects of the 1345 that are relevant.

20             THE COURT:  All right.

21             MS. MILLENACKER:  Your Honor, you're exactly right

22   when you ask about the timeliness of this current second

23   emergency motion to intervene.  It is untimely.  They came to

24   this Court in October, over seven months ago.  This is seven

25   months too late.  At that point in time they did not

1  challenge the factual or the legal underpinnings of the

2  receivership.  If they were going to do so, they should have

3  done it at that time.  We are way beyond questioning the

4  appropriateness of a receiver.  In fact, Ritchie itself had

5  put the same receiver in its Illinois state court action in

6  charge of both PCI and PGW and its motion was granted.

7          The only thing that has changed since the last time

8  that Ritchie was here and this time is that PGW is in

9  bankruptcy and actions in that forum are going full steam

10  ahead.  This week the Polaroid assets were sold for

11  approximately $80 million, and in fact, on March 5th, 2009,

12  Mr. Kelley in his role as receiver turned all right, title

13  and interest over to the Bankruptcy Court.  He no longer has

14  control of those assets, so it's a little curious to the

15  United States why Ritchie would bring at this particular time

16  a motion to intervene when Kelley as receiver doesn't even

17  have control of PGW in his role as receiver.

18          We assert that what Ritchie really wants through

19  this motion to intervene is to collaterally attack the

20  proceedings in the bankruptcy forum because the rulings have

21  not been going Ritchie's way.  They have objected to Kelley

22  as trustee to the U.S. Trustee's Office.  They tried to

23  challenge it, presenting many of these same arguments, saying

24  that Doug Kelley had a conflict.

25          When they lost that round, they brought their

1    objections to Judge Kishel.  Judge Kishel has an

2    excruciatingly detailed order that he issued February 26,

3    your Honor, closely examining all of these issues that are

4    here before us today, and essentially what Ritchie is doing

5    is, they're trying to litigate the validity of their security

6    interests in Polaroid in this forum.  You know, Congress has

7    provided a statutory scheme to litigate the priority, the

8    preference and the validity of security interests in

9    bankruptcy and this Court should not turn back the clock and

10   let Ritchie essentially have a do-over.

11          Ritchie has been a very active participant, as I

12   said, in the bankruptcy proceeding.  You know, as Judge

13   Kishel recognized, he said, quote:  "Ritchie, their exposure

14   is large, rendering high the stakes of their participation in

15   the bankruptcy process."  And as their papers here pointed

16   out, as their papers in the bankruptcy proceedings have

17   pointed out, what they really fear is the consolidation of

18   all of the creditors' claims, that their security interests

19   will be invalidated and that they will have to share in the

20   *pro rata* proceeds with the PCI creditors, but, your Honor,

21   that's a fight that should properly take place in Bankruptcy

22   Court.

23          As you know, Ritchie is currently appealing Judge

24   Kishel's order to the U.S. District Court here, so many of

25   these same arguments will be reached in U.S. District Court

on appeal.  Also going forward -- essentially at the heart of
this is the adversary action that Polaroid brought against
Ritchie, the Ritchie creditors, to contest the validity.

It's interesting.  In their reply papers filed late
Wednesday night they include all sorts of -- they include
some of the notes.  I believe there's three notes, for
40 million, 31 million, and 16 million.  One of those notes
was withdrawn.  I have information that one of the notes was
withdrawn.  But this is not an evidentiary hearing, your
Honor.  All of that should be sorted out in bankruptcy.  I
have information that another one of those notes was sold to
a different creditor, to another investment group and isn't
even held any longer by Ritchie, but that's not an issue for
this Court now.

What Ritchie failed to present to this Court on
Wednesday night was the e-mail traffic between Thane Ritchie
and Tom Petters and his executives showing that they knew
exactly where they were sending their money.  They were
sending it to PCI's M&I bank account.  I have a supplemental
affidavit I can offer into evidence today, your Honor, to
confirm that.

But in any event, Ritchie has another forum to sort
out these complex interests.  And moreover, not only do they
have the adversarial action, the appeal of Judge Kishel's
February 26 order, they have also exercised their right for

1   an election of a trustee, for an independent trustee of PGW,

2   and that is going to be taking place next week, April 22nd,

3   and it appears as the largest creditor that they'll have the

4   biggest voting block in that election process.  So they have

5   alternative ways to have their views heard.  What they're

6   essentially dissatisfied with is they keep losing in that

7   forum.

8           And it's a little absurd to think that Ritchie's

9   interests shouldn't be questioned in that forum as well, your

10  Honor.  These notes are at 80 percent, 362 percent.  These

11  are beyond commercially reasonable rates.  I mean, they

12  automatically raise red flags as to whether Ritchie is a

13  legitimate creditor, but that is not an issue for this forum.

14          THE COURT:  Doesn't that play right into

15  Mr. Kelly's argument, however, that there must have been some

16  collateral for these notes or these amounts wouldn't be lent

17  in the first place?

18          MS. MILLENACKER:  Well --

19          THE COURT:  The "We aren't idiots" argument.

20          MS. MILLENACKER:  Well, their business judgment is

21  at issue and they're coming into this court seeking

22  extrajudicial relief for some of their ill-advised business

23  decisions.  That is an issue that will get sorted out in

24  bankruptcy, your Honor.

25          Ritchie's interests are not unique.  If you let

1    Ritchie intervene in this action, we're going to have a

2    floodgate of every creditor that is currently in bankruptcy

3    appear here next week also seeking to intervene.  Those

4    creditors are abiding by the orderly process in bankruptcy

5    and it should be allowed to go forward.  Here, Ritchie cannot

6    meet the threshold requirements of a motion to intervene.  At

7    best they have an economic interest.  It appears it is

8    somewhat tenuous, but it really does not matter to the United

9    States whether their interest is secured or unsecured.  We

10   really don't have a dog in that fight.  They are like -- they

11   look like every other creditor to us.  It is not time for

12   distribution and that is an issue for another day, your

13   Honor.

14        Granting Ritchie's motion is going to have the

15   effect of invalidating the bankruptcy petitions and the

16   orders that have been entered in that forum.  We don't

17   believe that Ritchie has met the requirements of Rule 24 and

18   we ask that their motion be denied.

19        Thank you.

20        THE COURT:  All right.  Mr. Fuller, we'll talk

21   about 1345.

22        MR. FULLER:  Good morning, your Honor.

23        THE COURT:  Good morning.

24        MR. FULLER:  This Court's orders were fully

25   appropriate under 18 U.S.C. 1345, and by the way, that

1  statute has never been held unconstitutional in any respect.

2          Tom Petters was the 100 percent --

3          THE COURT:  Not a lot of law on it in the Eighth

4  Circuit, however, correct?

5          MR. FULLER:  I believe that's correct.

6          Tom Petters was the 100 percent owner of PGW and

7  Polaroid.  Fraud was clearly shown as to Tom Petters and his

8  associates and his assets were therefore subject to restraint

9  under 1345.  Tom Petters himself stipulated to the entry of

10  the preliminary injunction and no party, including Ritchie,

11  who attempted to intervene over six months ago, objected at

12  that time.

13          And stipulated preliminary injunctions under 1345

14  are commonplace.  The **Payment Processing Center** case cited by

15  Ritchie is one example of a case in which the order was

16  stipulated.  There's nothing improper about this.  And as I

17  listened to Mr. Kelly here today, I believe he acknowledged

18  that it's acceptable in principle for a stipulated order to

19  be entered, and if you look at the Court of Appeals decisions

20  that are being cited here, I believe you'll find that the

21  appellate courts are not regularly overturning stipulated

22  1345 orders.

23          I would like to just address briefly a few of the

24  details of the Rice affidavit which did form the principal

25  basis for the -- evidentiary basis for the Government's

1    motion.

2           THE COURT:   Before you talk about that, is the

3    list of the items that Tim Kelly gave me as appropriate to

4    review in assessing this the right evidence, do you think, to

5    consider, or are there other things that the Court may

6    consider?  I mean, there's this whole series of events that

7    have happened subsequent.

8           MR. FULLER:   We do not believe there's any

9    particular limit on what the Court can consider and we don't

10   believe that this is an evidentiary hearing.

11          THE COURT:   Should any consideration be given to

12   guilty pleas of other involved persons?

13          MR. FULLER:   I would say yes.  For example, Jim

14   Wehmhoff was a senior officer at PGW.  He was the executive

15   vice president for tax and finance at PGW and he has pled

16   guilty to preparation of false financials.

17          THE COURT:   In his guilty plea, did he discuss any

18   distinctions between PCI and PGW?

19          MR. FULLER:   I don't recall that at the moment.

20          So turning to the Rice affidavit, as the Court is

21   well aware, that affidavit established that a massive fraud

22   was being conducted by Tom Petters and others using numerous

23   business entities to trick investors into giving them

24   billions of dollars based on fake merchandise transactions.

25          Paragraph 4 of that affidavit set forth, quote,

1    probable cause to believe the defendants and their related

2    entities have been engaged in or are the recipients of

3    proceeds from a mail fraud, wire fraud and bank fraud scheme.

4         Paragraph 5 focused on financing activities of PCI

5    and affiliated entities and persons.

6         Paragraph 9 describes PCI as the venture capital

7    arm of numerous Petters enterprises, and that paragraph also

8    stated that money raised through PCI was, quote, used by

9    Petters for his other business ventures.  This clearly

10   encompassed PGW, which was listed in the complaint caption

11   and is certainly not exculpatory as to PGW.

12        Now, before the Government even filed its complaint

13   in this case, Ritchie had sued Tom Petters, PCI and PGW

14   together in Illinois state court, accusing them all of fraud

15   and seeking appointment of a receiver in that forum.

16        The evidence, of course, continues to accumulate.

17   The indictment of Petters, PCI and PGW is not irrelevant

18   here.  The **Guess** case out of I believe the Southern District

19   of California which is cited by Ritchie relied on the lack of

20   an indictment and found that relevant in that situation.

21        The grand jury here has found that PGW committed

22   not only money laundering, but mail and wire fraud.  And

23   contrary to Ritchie's argument, money laundering is in fact

24   one of the specified banking law violations that can support

25   an order under 1345(a)(2).

1           THE COURT:   What's the authority for that?

2           MR. FULLER:   That's discussed in the -- it's

3    explained in footnote 3 of the **Payment Processing Center**

4    decision.

5           Additional evidence that has come forth in the

6    bankruptcy proceeding has also revealed the substantial

7    interconnection between these companies; for example,

8    frequent intercompany transfers, and then, of course, there's

9    the affidavit of Doug Kelley that shows that Ritchie's PGW or

10   supposed PGW investment in fact was deposited into a PCI

11   account and that money was evidently used to pay off PCI

12   investors.

13          THE COURT:   That's the same M&I account Ms.

14   Millenacker was talking about?

15          MR. FULLER:   That's correct.   In addition, it's

16   been shown that Polaroid was purchased entirely or virtually

17   entirely with PCI money.   And we don't believe that the Kelly

18   affidavit that we submitted should be scrutinized at this

19   time subject to the rules of evidence.   It's simply an

20   additional piece of information reflecting the ongoing

21   development of the facts in this criminal investigation.

22          Turning to 1345 and the terms of that statute,

23   there are two separate provisions enabling the restraint of

24   assets.   1345(a)(2), as we've heard, relates specifically to

25   banking law and health care violations.   1345(B), which was

1    the original catch-all provision for asset restraints and

2    predated the banking law specific 1990 amendment applies to

3    mail and wire fraud.  And the receivership here --

4         THE COURT:  Did the 1990 amendment discuss that at

5    all, that is, the application to mail and wire fraud ?

6         MR. FULLER:  I'm not sure about the legislative

7    history, your Honor, but numerous courts have found that the

8    addition of the banking law specific (a)(2) provision in no

9    way diminished the authority of the courts or the authority

10   that Congress intended under 1345(b).  So the receivership

11   here was based on both prongs or at least could have been,

12   could have arisen under 1345(a)(2) or 1345(b).

13        The **Payment Processing Center** court once again, at

14   footnote 6 has indicated that 1345(a)(2), which is the

15   provision that relates to equivalent assets or assets of

16   equivalent value, 1345(a)(2) provides a, quote, useful

17   template for courts that impose property restraints under

18   1345(b).  And again, of course, 1345(b) is -- clearly invokes

19   the equitable powers of the court.  So Congress in drafting

20   this statute has authorized courts to resort to equitable --

21   their equitable powers.

22        1345 was designed to be used in connection with an

23   early snapshot of unfolding criminal investigations.  The

24   Government was not required to spell out every detail of the

25   complex fraud scheme or explain the connections between the

1    more than 150 Petters entities.  And 1345 does not demand

2    meticulous tracing of every dollar of the fraud, particularly

3    given the authority to freeze property of equivalent value.

4            THE COURT:  I guess I'd like you to use the last

5    couple minutes of your argument time to address what I think

6    is sort of a new argument or at least one that wasn't briefed

7    about, this adverse effect on financial institution argument,

8    paragraph 10 of the second amended complaint.  What's the

9    Government response to that argument?

10           MR. FULLER:  That is actually new to me

11   personally, so I might defer to one of my colleagues.

12           THE COURT:  Mr. Brooker, it looks like you've been

13   substituted into the lineup here.

14           MR. BROOKER:  Never a dull moment in this case

15   reacting to last-minute arguments from the Ritchie folks.

16           Your Honor, as I best can make out the argument, I

17   think -- I think they're demanding of the Government early on

18   in a 1345 civil complaint something that Congress did not

19   intend us to do.

20           Now, clearly you had the money laundering hook

21   already to the banking law violation that gives clear

22   authority to freeze equivalent value, equivalent assets to

23   the fraud.

24           And remember -- I think Ritchie ignores this --

25   that they play this game that PGW is some third-party,

1    unrelated entity to Petters himself.  If you look at the

2    flowchart, everything starts with Tom Petters and breaks up

3    between PGW and PCI and there are about 150 entities that

4    were used and it's this tangled web, but they're not some

5    innocent third party walking down the street that has nothing

6    to do with PGW, and the Eileen Rice affidavit clearly brings

7    in PGW and all of Petters entities and related business

8    entities into that 1345.

9         Because the adjective "adversely" is not used in

10   the civil complaint in the 1345 action, I just don't think

11   that gets them anywhere.  Money laundering is part of the

12   banking law violations that Congress bootstrapped into 1345,

13   your Honor.  I think we're on safe ground there under (a)(2),

14   and I think you cannot ignore your powers under (b), subpart

15   (b) of 1345, which Congress specifically said a district

16   court can take any -- take other action.  And courts have

17   said -- and, you know, I'm the one that took that **Liner** case

18   to the Eighth Circuit.  It's an unpublished decision, but in

19   that case we froze equivalent value of the fraud and that was

20   specifically addressed in the briefs.  The Eighth Circuit

21   didn't seem to have a problem with it at that time.

22        We certainly didn't do meticulously tracing at that

23   point because you have, your Honor, at that point --

24   typically, 1345s -- and Congress knew this, it's in the

25   legislative history -- would be exercised early in a criminal

1   investigation when a search warrant is even being executed.

2   So clearly the Government doesn't even have the documents

3   early on a case.  They're still acquiring the documents

4   through a search warrant.  Congress was very concerned that

5   as long as you had a banking law violation, healthcare fraud

6   violation, mail fraud, wire fraud, you get the powers of the

7   1345, your Honor.

8            So, I think much is being made of the word

9   "adversely" lacking in the 1345 complaint.  I don't think it

10  gets them anywhere.

11           THE COURT:  All right.  Thank you for the

12  response.

13           I think we'll move on to -- I think you've actually

14  used up your time, but I'll give you an additional five

15  minutes to address anything you want to by way of -- Mr.

16  Fleming, did you want to be heard before Mr. Kelly on this

17  matter?

18           MR. FLEMING:  No.

19           THE COURT:  Okay.

20           MR. KELLY:  Mr. Fuller says, well, forget about

21  (a)(2).  Maybe we don't qualify under (a)(2).  Let's go to

22  (b).  Go back to the complaint, your Honor.  A lot of

23  reference to (a)(2), not a word about (b).  Nothing in any of

24  the complaints about (b).

25           You raised the issue of the Wehmhoff guilty plea.

1    I was unprepared for that.  My gut tells me that it may have

2    some weight with you, but I think only if -- if he admits to

3    wrongdoing at PGW.  If he did that and if that's in the

4    record somewhere, then you may want to give that some weight,

5    but I doubt that's what happened.  I don't know, but I'm very

6    skeptical about that.

7            You also asked about any other evidentiary basis

8    other than those four items I mentioned in that big stack of

9    stuff.

10           Government Exhibit A to the Millenacker affidavit

11   is a -- it's a legal brief in opposition to Ritchie's

12   objection to Kelley being appointed the trustee.

13           THE COURT:   So this was some time ago.

14           MR. KELLY:   It's about six weeks ago, I think.

15           THE COURT:   Okay.

16           MR. KELLY:   But it is verified by Doug Kelley as

17   to the -- the last page is a verification by Doug Kelley as

18   to the facts.  And Exhibit D-1 is a schedule of where -- the

19   money coming into PCI.  And so I want to keep my skirts clean

20   with you.  I think one could argue that that is evidentiary.

21           I do want to make a brief comment about -- I think

22   there's a mootness argument raised in their papers.  By the

23   way, they didn't raise the automatic stay, and if the Court

24   is going to put some weight on that, you got to give me a

25   chance to respond to it.

1          THE COURT:  I will.

2          MR. KELLY:  I'm unable to do that standing here

3     today.  I'm ignorant.  But on the mootness issue, just a

4     couple of points.

5          Mootness is an odd -- it's kind of a disfavored

6     doctrine in the sense that there's a heavy burden and

7     especially in cases where the issue is was an order improper.

8     There's a case from the Tenth Circuit, **Smith vs. Phillips**,

9     881 F.2d 902, where a writ was challenged.  The writ was

10    challenging an order.  It says:  "Because the writ challenges

11    the very power of the judge to issue the disputed orders, we

12    question whether this issue ever could be moot."

13         But more fundamentally here, you need to look at

14    the facts, your Honor.  We got two piece pieces of collateral

15    here.  We got a pledge of Petters LLC notes, and Petters LLC

16    is a PGW sub that is not in bankruptcy, so our efforts to ask

17    you to vacate as to the PGW, at least as to that sub, is not

18    affected by the bankruptcy.

19         As to the bankruptcy, I mean, we make no bones

20    about it.  We want you to vacate that aspect of the order so

21    we can go down to the Bankruptcy Court and say that the

22    bankruptcy was improperly commenced.

23         Thank you, your Honor.  That's all I have.

24         THE COURT:  All right.  Thank you.

25         Mr. Fleming as counsel for the receiver.

1        MR. FLEMING:   Thank you, your Honor.

2        Your Honor, first with respect to this automatic

3    stay issue, by operation of law, Doug Kelley no longer is the

4    receiver for PGW.  He was authorized to file a bankruptcy

5    petition.  He did that back in October, October 11th, six

6    months ago, and by operation of law he no longer is the

7    receiver for the PGW assets.  That is controlled by the

8    Bankruptcy Court.

9        THE COURT:   He switched from a receiver hat to a

10   trustee hat, is that --

11       MR. FLEMING:   Yes.  I mean, in the first instance

12   it's just in bankruptcy and then he was later appointed as

13   trustee, but as the Bankruptcy Court stated:  "The assets of

14   the debtor will no longer be subject to administration

15   through the receivership.  The receiver's jurisdiction and

16   control over the entities at issue here are over."

17       Now, another issue that has been raised is whether

18   Ritchie's interest will be impaired --

19       THE COURT:   Before we move on to another subject

20   -- so are you telling me that since the curtain came down on

21   the receivership, that there did need to be a motion before

22   they came here to lift the stay, for relief from the stay?

23       MR. FLEMING:   Yes.

24       THE COURT:   All right.

25       MR. FLEMING:   The assets are controlled by the

1    Bankruptcy Court at this point.

2             But secondly the issue is, well, are Ritchie's

3    interests impaired if they're not allowed to intervene in any

4    way.  Well, their interests are the liens that are at issue.

5    There's an adversary proceeding in the Bankruptcy Court right

6    now which raises that very issue.  There's a statutory scheme

7    that controls.  There will be discovery, a full right to

8    conduct depositions.  All of their due process rights will be

9    protected with regard to this interest.  So their interest

10   will not be impaired if this Court does not allow them to

11   intervene.

12            But I'd like to spend --

13            THE COURT:  They also have an appellate right to

14   come back here at the conclusion of that, correct?

15            MR. FLEMING:  Yes.  I'd like to talk about this

16   issue about the timeliness, because Rule 24 has an express

17   timeliness requirement, and we're talking about a six-month

18   delay between the time that a receiver was appointed and the

19   commencement of this motion.  And they certainly have been

20   aware of the appointment of the receiver, of the fact of the

21   bankruptcy.  And real significantly, all of the facts upon

22   which they rely in coming in here today they were aware of

23   back in October.  There aren't any new facts that they rely

24   upon.

25            And it's of more than passing significance of what

1    they were doing at the time, the reasons why back in October

2    they did not raise the issues they're raising now.  Because

3    you remember back then they were not contesting the

4    appropriateness of appointing a receiver.  It was just the

5    identity of the receiver.  Well, the reason that they were

6    not contesting the appropriateness of the receiver was the

7    lawsuit that they had filed in state court out in Illinois,

8    and this is Exhibit E to their memorandum in support of their

9    motion to intervene.

10          In that complaint, which is a complaint by the

11   Ritchie entities against PGW, PCI and Tom Petters, on page 2,

12   paragraph 4, they say:  "Defendants defrauded Plaintiffs,"

13   "Defendants" meaning all three, PGW, PCI and Thomas Petters.

14          On page 3 they say:  "Accordingly, Defendants

15   fraudulently induced Plaintiffs into signing the note

16   purchase agreement and the extension agreement and into

17   purchasing notes from Defendants."

18          In their own complaint back in October, they were

19   the ones who were alleging that PGW, PCI and Petters were

20   engaged in a fraud to the extent that they sought a state

21   court to appoint a receiver based on that fraud.  So the

22   reason back in October they weren't making the arguments they

23   are making now is because they really couldn't.  They had

24   just been in court seeking expedited relief based on the

25   fraud of the entities, including PGW, and certainly those are

1  facts that you can consider because they predated the time of

2  your order back in October.

3         Finally, with respect to these documents that were

4  submitted in the affidavit of Mr. Kieley shortly before this

5  hearing, what's interesting about those notes are that they

6  are notes between PGW -- in one case, actually, Petters

7  Capital and Ritchie, but they really do raise this issue.  I

8  mean, Mr. Kelly says, well, we're not idiots of entering into

9  these notes, but this is the issue:  It raises suspicion.  It

10 is not commercially reasonable when there are a series of

11 notes at extraordinary interest rates.  There's no attempt to

12 obtain security for those notes, but then months later -- the

13 notes are in February of 2008.  It is not until September of

14 2008, literally days before the raid on Petters headquarters

15 and the arrest of Mr. Petters, that there's an attempt to

16 obtain these security interests not from PGW, but from

17 Polaroid.  I mean, it naturally raises suspicions, just the

18 facts themselves, and it's not explained by, you know, the

19 rhetorical question that we're not idiots.  To the contrary,

20 it raises suspicions about why they were engaging in those

21 activities and in that manner.

22        That's all I have, your Honor.  Thank you.

23        THE COURT:  All right.  I think, Mr. Kelly, out of

24 fairness I should give you a minute or two to rebut that

25 argument.  I am --

1          MR. KELLY:   The only thing I would respond to is

2     kind of the aren't you changing positions in an untimely

3     fashion, and the answer is yeah, we are changing positions.

4     When we came here before I wasn't involved, but, you know, we

5     were asking for a single receiver, and as you point out, we

6     just didn't like the one that had been selected.

7          But on October 31 we changed our position.  That's

8     Exhibit D to the Millenacker affidavit.  I write to Doug

9     Kelley saying:  Look, you got a conflict here.  We recognize

10    what the situation is now, we have more information, and you

11    can't continue wearing both hats as PGW/PCI, and he's never

12    denied that to this day, not even his -- I forget the name of

13    the document in bankruptcy where you've got to disclose your

14    qualifications and your conflicts.  He doesn't even deny it

15    there.  He just says:  Don't worry about it.  I can work with

16    it.

17         THE COURT:   It is correct, is it not, that at the

18    time of the Illinois suit, that there wasn't any discernible

19    difference that Ritchie was taking between assets of PGW and

20    PCI?  I mean, they were painting with the same broad brush.

21         MR. KELLY:   No, no.  I -- well, yes and no is the

22    answer.  On the one hand we were saying we had PGW notes.

23    There's no question about that.  But we were also saying --

24         THE COURT:   We have to have a receiver take

25    control of the whole thing here to sort it out.

1          MR. KELLY:   Yeah.   I would adopt Mr. Brooker's

2     argument that, you know, when the shooting starts you got to

3     be over-assertive.

4          THE COURT:   It's a stop-the-bleeding kind of

5     statute.

6          MR. KELLY:   Exactly, exactly.   Let's have some

7     emergency treatment.

8          I'll tell you, you know where I really end up on

9     this statute?   The hole in this statute, to solve all of the

10    concerns that we're bringing you here today, is if the

11    Government put a big net around everything initially, but

12    then 30, 60, or 90 days later came back in and said, "We've

13    looked at this more closely.   Here's the stuff we have a

14    right to claim.   Here's the stuff we don't have a right to

15    claim."   All of these cases would be avoided.

16         THE COURT:   Do you really think in a massive fraud

17    like this with the complications and the number of entities

18    and whatever, 30 to 60 days is going to be a time to --

19         MR. KELLY:   Most of these -- I mean, the big deal

20    here is the $3 billion number.   The $3 billion number kind of

21    drives the size of the net.

22         THE COURT:   I don't know that that drives it so

23    much as the number of entities and the complications --

24         MR. KELLY:   No, it's that no matter how much money

25    you find under this rock, it still doesn't get to three

1    billion.  I think that's what drives it.

2            THE COURT:   All right.

3            MR. KELLY:   Thank you, your Honor.

4            THE COURT:   I think I've heard the arguments and

5    obviously I'll take that motion under advisement.

6            There's one other matter that I have before me

7    which I think is fairly straightforward and that is the

8    stipulation between the United States relating to the Munson

9    matter on establishment for a registry account.  And I don't

10   see Mr. Tanick present, but I understand that that's agreed

11   to at this point, is that correct?

12           MS. MILLENACKER:   Yes, your Honor.  Mr. Tanick has

13   signed off on that stipulation as has the receiver's office

14   and the United States.

15           THE COURT:   All right.

16           MS. MILLENACKER:   And we've submitted that for the

17   Court's consideration, so it is no longer an issue.

18           THE COURT:   All right.  I'll review it and absent

19   any problem probably sign it later this afternoon.

20           All right.  Court is in recess.

21       (Proceedings concluded at 10:00 a.m.)

22                        *  *  *  *  *

23

24

25

**C E R T I F I C A T E**

I, **TIMOTHY J. WILLETTE**, Official Court Reporter

for the United States District Court, do hereby

certify that the foregoing pages are a true and

accurate transcription of my shorthand notes,

taken in the aforementioned matter, to the best

of my skill and ability.


*/s/ Timothy J. Willette*

**TIMOTHY J. WILLETTE, RDR, CRR, CBC, CCP**
Official Court Reporter – U.S. District Court
1005 United States Courthouse
300 South Fourth Street
Minneapolis, Minnesota  55415-2247
612.664.5108