**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

United States of America,

        Plaintiff,

  v.

Thomas Joseph Petters; Petters Company,
Inc., a/k/a PCI; Petters Group Worldwide, LLC;
Deanna Coleman, a/k/a Deanna Munson;
Robert White; James Wehmhoff; Larry
Reynolds and/or d/b/a Nationwide International
Resources, a/k/a NIR; Michael Catain and/or d/b/a
Enchanted Family Buying Company;
Frank E. Vennes, Jr., and/or d/b/a Metro Gem
Finance, Metro Gem, Inc., Grace Offerings
of Florida, LLC, Metro Property Financing,
LLC, 38 E. Robinson, LLC, 55 E. Pine, LLC,
Orlando Rental Pool, LLC, 100 Pine Street
Property, LLC, Orange Street Tower, LLC,
Cornerstone Rental Pool, LLC, 2 South
Orange Avenue, LLC, Hope Commons, LLC,
Metro Gold, Inc.;

        Defendants,

Douglas A. Kelley,

        Receiver,

Gary Hansen,

        Receiver.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 08-5348 ADM/JSM

---

James M. Ventura, Esq., Wayzata, MN on behalf of Joan Kenney Catain.

James S. Alexander and Surya Saxena, Assistant United States Attorneys, Minneapolis, MN, on behalf of Plaintiff.

Steven E. Wolter, Esq., Kelley, Wolter & Scott, P.A., Minneapolis, MN on behalf of Receiver Douglas A. Kelley.

---

## I. INTRODUCTION

Receiver Douglas A. Kelley ("Receiver Kelley") controls property and funds of Defendant Michael Catain ("Defendant Catain") in the Catain Receivership[1] that are subject to an asset freeze ordered on October 3, 2008.  TRO [Docket No. 6]; Receivership Order at 7-9, 13.  On January 14, 2011, the Court heard oral argument on Receiver Kelley's motions [Docket Nos. 1615, 1619, and 1623] to: (1) sell two music catalogues belonging to the Catain Receivership; and (2) transfer funds from an Anchor Bank checking account in the name of Q Records and Entertainment ("Q Records") to the Catain Receivership checking account.

The Court also heard oral argument on motions [Docket Nos. 1656 and 1657] by Defendant Catain's wife, Joan Kenney Catain ("Joan Catain").  Joan Catain seeks:  1) denial of Receiver Kelley's motion to transfer the Q Records funds from Anchor Bank to the Catain Receivership checking account; 2) an accounting by Receiver Kelley of the Q Records funds at Anchor Bank; 3) Receiver Kelley's release of all Q Records' funds, ownership rights, and interests to Joan Catain and her son Michael Catain, Jr. ("Catain Jr."); and 4) payment to Joan Catain of her claimed share of the sale proceeds from the Catain home or, alternatively, an extension of monthly living expense payments from Catain Receivership funds.

At the hearing, counsel for Joan Catain also opposed Receiver Kelley's motions to sell the music catalogues, implying the sales are not arm's-length transactions because the entities purchasing the music catalogues are owned in part by Eric Foss ("Foss"), Defendant Catain's

---

[1] The Catain Receivership encompasses all assets of Defendant Michael Catain ("Defendant Catain") and all entities 100% owned or controlled by him.  See Second Am. Order for Entry of Prelim. Inj., Appointment of Receiver, and Other Equitable Relief, Dec. 8, 2008 ("Receivership Order") [Docket No. 127].

former employee.  Foss provided Receiver Kelley with an affidavit in support of the Q Records motion, and Foss' wife allegedly provided real estate services to the Catain Receivership.  Joan Catain also argued that she holds a one-half marital property interest in the music catalogues to the extent they were not affected by the fraud.

Plaintiff United States of America ("the Government") opposes Joan Catain's motions.  See Docket No. 1740.  The Government argues forfeiture proceedings are actively underway in Defendant Catain's criminal case, and the Government expects to forfeit all or substantially all of the assets currently held in the Catain Receivership.  Therefore, the Government argues an ancillary forfeiture proceeding serves as the proper and exclusive avenue for Joan Catain to litigate her interests in the proceeds of the Enchanted Point home and in Q Records.  The Government opposes payment of Joan Catain's monthly living expenses and health insurance premiums, arguing she has not shown the requested amounts are justified or that she will suffer harm or prejudice if such expenses are not paid.

At the hearing, the Court granted the parties leave to submit supplemental affidavits on the issue of Foss' ownership interest in the entities purchasing the music catalogues and the issue of Joan Catain's living and health insurance expenses.  Following the hearing, Receiver Kelley filed supplemental affidavits [Docket Nos. 1759, 1760] concerning the extent of Foss' ownership interest, if any, in the entities purchasing the music catalogues.  Joan Catain filed a supplemental affidavit [Docket No. 1752] attesting to her monthly living and health insurance costs.

## II.  BACKGROUND

### A.  Assets Restrained

On October 2, 2008, the Government commenced this case under the Fraud Injunction

Statute, 18 U.S.C. § 1345, to freeze the assets of the named defendants, as well as any affiliates, subsidiaries, divisions, successors, or assigns that are 100% owned or controlled by them. Compl. [Docket No. 1]. The defendants were accused of committing mail fraud, wire fraud, and banking law violations by perpetrating what was later proven to be a multi-billion-dollar Ponzi scheme. See Rice Aff. [Docket No. 5] at 1-2, 20. To preserve the assets for restitution and forfeiture in the event related criminal actions resulted in conviction, the Court issued an *ex parte* temporary restraining order ("TRO") freezing all assets belonging to the defendants on October 3, 2008. TRO [Docket No. 6].

Within two weeks of the entry of the TRO, all defendants, including Defendant Catain, stipulated to the entry of a preliminary injunction and appointment of a receiver to assume control of their assets. See Stip. for Entry of Prelim. Inj., Appointment of Receiver, and Other Equitable Relief, Oct. 15, 2008 [Docket No. 54]. Receiver Kelley was appointed as the receiver for all defendants except Defendant Frank E. Vennes, Jr. ("Defendant Vennes"). Receivership Order at 13.

Ultimately, all individual defendants except Defendant Vennes were charged and convicted for crimes arising from the Ponzi scheme. Defendant Catain pleaded guilty on October 8, 2008 to conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). United States v. Catain, 08-cr-302 (RHK) (D. Minn.) ("Criminal Case") [Criminal Case Docket No. 3]. Defendant Catain admitted that he directed approximately $12 billion from 2002 to 2008 through Enchanted Family Buying Company ("EFBC"), a shell corporation with no real operations, in order to conceal and continue the fraudulent scheme. See Information [Criminal Case Docket No. 1] at 2. The FBI estimates Defendant Catain received approximately $16

million in "commissions" for his role in the scheme.  Lamb Decl. [Docket No. 1741] at ¶ 5.

### B.     Living Expense Payments

From December 2008 until September 2010, Receiver Kelley made court-authorized, monthly payments of $3690 per month to Defendant Catain for living expenses and health insurance premiums.  See Order, Dec. 16, 2008 [Docket No. 151] at 3; Kelley Aff. [Docket No. 136] Attach. H.  The Court also authorized Receiver Kelley to pay college expenses in an amount that allowed Defendant Catain's younger son to complete the semester ending December 18, 2008.  Id.  Receiver Kelley ceased making the monthly payments when Defendant Catain began serving his prison sentence.

### C.     Forfeiture Ordered[2]

On September 9, 2010, a preliminary order of forfeiture ("Forfeiture Order") was entered requiring Defendant Catain to forfeit all real or personal property "involved in or traceable to the money-laundering conspiracy" and entering a personal money judgment against him in the amount of $3,522,880,614.[3]  Forfeiture Order, Sept. 9, 2010 [Criminal Case Docket No. 46] ¶¶

---

[2] Restitution was denied in the individual defendants' criminal proceedings, because the burden restitution would have imposed on the court outweighed the benefit victims would have realized on their restitution claims.  See United States v. Petters, 08-364 RHK/AJB (D. Minn.) ("Petters Criminal Case"), Order, June 3, 2010 [Petters Criminal Case Docket No. 459].  Instead, victims are to receive a recovery through the bankruptcy process and/or through the remission of forfeited assets under 28 C.F.R. § 9.8.  Id. at 9-11.  A Coordination Agreement to facilitate this process was approved on September 14, 2010.  See Order Approving Coordination Agreement [Docket No. 1466], Sept. 13, 2010; Uphoff Aff. [Docket No. 1351] Ex. A (Coordination Agreement).  Under the Coordination Agreement, the individual criminal defendants' assets, currently held in receivership, will be forfeited by the Government.  The Government will then initiate a remission process through which victims will be allowed to submit claims.

[3] As of February 2, 2011, the balance in the Catain Receivership account was approximately $1,377,018.  Fourteenth Status Report of Receiver Douglas A. Kelley [Docket No. 1768] at 4.

2-3. The Forfeiture Order became final upon Defendant Catain's sentencing. See Id. ¶ 6; Fed. R. Crim. P. 32.2(b)(4)(A).

As allowed under the Forfeiture Order, the Government is conducting discovery to identify the specific property involved in or traceable to the money-laundering conspiracy.[4] Forfeiture Order ¶ 5. The Government also anticipates amending the Forfeiture Order to include the forfeiture of substitute property. See Id. ¶ 6. The Government predicts all or substantially all assets presently held in the Catain Receivership will be identified as property traceable to or involved in Defendant Catain's crime or, if such property is no longer available, as substitute property. Pl.'s Mem. of Law in Opp. [Docket No. 1740] at 7, 15.

Through their pleadings and at the hearing, the parties have submitted evidence to support their competing claims to certain assets held in the Catain Receivership.

        **1.    4550 Enchanted Point Sale Proceeds**

In July 2009, the Catain residence at 4550 Enchanted Point Drive was sold for $2.4 million, and net sale proceeds of $1,274,363.40 were placed into an escrow account as ordered by the Court.[5] Order, July 7, 2009 [Docket No. 446] at 3; Ventura Aff. Ex. C. The Order made "no finding as to the ownership of the sale proceeds from the [4550 Enchanted Point] Property." Order, July 7, 2009 at 3. Joan Catain claims a one-half marital interest in the proceeds and has filed an affidavit describing the 4550 Enchanted Point property as property acquired during her

---

[4] Federal Rule of Criminal Procedure 32.2(b)(2)(C) allows a forfeiture order to describe the forfeitable property in general terms until the specific property subject to forfeiture can be identified.

[5] Joan Catain alleges the net sale proceeds were improperly reduced by $113,082.48 to pay a tax lien on the Excelsior Bay Car Wash, and by $126,725.70 in fees paid to Receiver Kelley's law firm. Ventura Aff. [Docket No. 1660] at ¶¶ 9-10.

marriage to Defendant Catain and owned by them as joint tenants. First Joan Catain Aff. [Docket No. 1661] at 2. The Government has submitted an affidavit stating that, while the process of tracing the funds used to purchase and improve the 4550 Enchanted Point property is not yet complete, over $1,160,000 of the funds used to construct the home on the property are directly traceable to criminal proceeds. Lamb Aff. [Docket No. 1741] ¶ 7. At the hearing, the Government stated it has recently received the discovery responses necessary to complete the tracing process, and that the tracing will soon be finalized.

### 2.     Q Records

Q Records was established in 2006 as an independent music label company licensed to distribute digital music via iTunes. First Joan Catain Aff. ¶ 28; First Kelley Aff. [Docket No. 1621] Ex. 4 (Foss Aff.) ¶ 3. Joan Catain asserts she and Catain Jr. are the sole owners of Q Records. Q Records' Member Control Agreement, which is not publicly filed, lists Joan Catain and Catain Jr. as Q Records' only members and lists Defendant Catain as the manager. Catain Jr. Aff. [Docket No. 1744] Exs. C and D. Catain Jr. testified at the hearing that the concept of distributing music via iTunes was his idea, and he and Joan Catain were designated as the owners of Q Records so they could learn about the music business. Catain Jr. further testified that Defendant Catain provided the music library from which the music was digitally distributed by Q Records. According to Catain Jr., the Q Records company did not need to be funded or managed because royalties from the digital downloads were automatically paid to Q Records. Catain Jr. opened a checking account for Q Records at US Bank in the fall of 2008, three weeks after the Catain Receivership and asset freeze were established. Catain Jr. testified the US Bank account has a balance of $1,200, and that no royalties from Q Records ever came into that

account.  He was not aware of the Q Records checking account at Anchor Bank until James Molnar ("Molnar"), an investigator retained by Receiver Kelley, informed him of the account. Catain Jr. testified that he now understands the Anchor Bank account received Q Records' automated royalty payments that were generated from the music downloads.  The Q Records account at Anchor Bank presently has a balance of approximately $59,000.  Kelley Aff. ¶ 6.

Receiver Kelley contends Joan Catain and Catain Jr.'s ownership of Q Records is in name only, and that the entity is actually owned by Defendant Catain.  To support this position, Receiver Kelley notes the Q Records account at Anchor Bank lists Defendant Catain as the sole signator.  At the hearing, Molnar provided testimony regarding an IRS document dated June 27, 2006 addressed to "Q RECORDS & ENTERTAINMENT LLC MICHAEL CATAIN SOLE MBR."  Pl.'s Ex. 3 at 1.  The document provides notice of Q Records' employer identification number and includes a copy of the application for the employer identification number.  The application is dated June 21, 2006 and lists Michael Catain as Q Records' "officer, general partner, grantor, owner, or trustor."  Id. at 4.

Receiver Kelley also provided affidavit testimony from Foss, who worked for Defendant Catain in his several record companies.  Foss avers Defendant Catain created Q Records "as a way to distribute his [music] content outside of his regular record Distributor."  First Kelley Aff. Ex. 4 (Foss Aff.) ¶ 3.  Foss avers Defendant Catain told him he had used Catain Jr.'s name as the owner of Q Records when he formed the entity.  Id. ¶ 4.  Foss further states he and Defendant Catain operated Q Records, and Catain Jr. never worked for and had no involvement in the entity.  Id. ¶¶ 6-8.

## III.  DISCUSSION

A.  **Joan Catain's Motions for Disbursements of Funds or, Alternatively, Living Expenses**

Joan Catain requests 1) the release to her and Catain Jr. of all Q Records funds and ownership interests; and 2) the disbursement to her of half the 4550 Enchanted Point sale proceeds or, alternatively, living expenses.  She bases her requests on the assertion that she holds a property interest in those assets.  She argues the pre-forfeiture restraint of property allegedly belonging to her violates her Fifth Amendment due process rights.

In response, the Government argues that it has commenced forfeiture proceedings under 18 U.S.C. § 982(a)(1), and therefore Joan Catain's claim to the forfeitable property must be litigated in an ancillary forfeiture proceeding under 21 U.S.C § 853(n).[6]

Generally, an ancillary proceeding under § 853(n) is the only avenue by which a third-party claimant may seek to assert an interest in property that is alleged in an indictment or information to be subject to forfeiture.  United States v. Puig, 419 F.3d 700, 703 (8th Cir. 2005); 21 U.S.C. § 853(n).  See also 21 U.S.C. § 853(k) (barring intervention in criminal proceedings or the commencement of an action against the United States except as provided for in an ancillary proceeding under § 853(n)).  However, early in this case the Court recognized that a narrow exception to the general rule may be warranted where the delay between the entry of the property restraint and the criminal trial "threatens to deprive a third party of its due process right to have a 'meaningful hearing at a meaningful time.'"  Mem. Opinion and Order, June 23, 2009 [Docket No. 396] at 8 (quoting United States v. Bissell, 866 F.2d 1343, 1353 (11th Cir. 1989)).

---

[6] The forfeiture provisions of 21 U.S.C. § 853 are incorporated by 18 U.S.C. § 982(b)(1).

The due process test of <u>Barker v. Wingo</u>, 407 U.S. 514 (1972) provides an appropriate analysis for determining whether the delay between the seizure of property and the commencement of forfeiture proceedings violates a third party's "due process right to be heard at a meaningful time." <u>United States v. Eight Thousand Eight Hundred and Fifty Dollars ($8,850) in United States Currency</u>, 461 U.S. 555, 564 (1983). <u>See</u> also <u>Bissell</u>, 866 F.2d at 1352-54; <u>United States v. Arboleda-Hurtado</u>, 790 F. Supp. 1140, 1142-43 (S.D. Fla. 1992). "The <u>Barker</u> test requires the weighing of four factors: [t]he length of the delay in the criminal proceedings; the reason for the delay; the property claimant's assertion of his [or her] right to a hearing; and the prejudice to the claimant." <u>Arboleda-Hurtado</u>, 790 F. Supp. at 1142. The factors serve as "guides in balancing the interests of the claimant and the Government to assess whether the basic due process requirement of fairness has been satisfied in a particular case." <u>United States v. $8,850</u>, 461 U.S. at 565.

Applying the <u>Barker</u> factors to the present circumstances leads to the conclusion that, pending the commencement of the ancillary proceeding, Joan Catain's due process rights are not violated by the continued restraint of the assets in the Catain Receivership, but that modest payments toward Joan Catain's living expenses and health insurance premiums are justified.

    **1.**    **Length of Delay**

The two-year delay from the entry of the asset restraint and the commencement of the forfeiture proceedings is significant. However, the effects of the delay have been alleviated by Joan Catain's not being wholly deprived of the property to which she claims an interest. Specifically, receivership funds were used to pay Joan Catain's living expenses and health insurance until September 2010. Moreover, the Government represents the period of delay will

10

soon be over, as the forfeiture proceedings have commenced and the discovery necessary for tracing the criminal proceeds is actively underway. The Government anticipates bringing a motion in the criminal action as to the sale proceeds of 4550 Enchanted Point by March 7, 2011. Pl.'s Mem. of Law in Opp. at 3.

### 2. Reason for Delay

The two-year delay was not caused by any lack of diligence by the Government and is justified under the circumstances. Substantial time and resources were required to trace the assets involved in this enormous and complex Ponzi scheme. Forensic accountants retained by Receiver Kelley worked intensely for approximately two years to untangle the scheme. See Martens Aff. [Docket No. 1391]. Additionally, the determination of how the individual defendants' assets would be treated remained unclear until the June 2010 determination that criminal restitution would not be ordered and the September 2010 Coordination Agreement was reached as a result of that determination. The Government initiated forfeiture proceedings against Defendant Catain in September 2010, the same month the Coordination Agreement was reached and Defendant Catain was sentenced.

### 3. Assertion of Right to a Hearing

Joan Catain was provided with a hearing on January 14, 2011 regarding her request for disbursement of receivership assets. She was also allowed an opportunity to submit affidavit and witness testimony supporting her third party claims. The evidence and arguments presented raise fact issues that are properly litigated in an ancillary forfeiture proceeding, and do not warrant an earlier or separate proceeding to resolve the third party claims.

Joan Catain claims an entitlement to a one-half marital interest in the sale proceeds from

4550 Enchanted Point.  However, her affidavit supporting this request states that proceeds from a home purchased by Defendant Catain and Joan Catain in 1996 were used to purchase a home at 4360 Enchanted Drive in 1998, and that the 4550 Enchanted Point property was purchased in July 2005 "while [the Catains] still owned the house at 4360 Enchanted Drive."  Second Joan Catain Aff. at 2.  Therefore, Joan Catain does not identify what marital property, if any, was used to purchase the 4550 Enchanted Point property.  Additionally, the Government has submitted affidavit testimony stating over $1,160,000 of the amount spent by Defendant Catain to construct a home on the 4550 Enchanted Point property was paid with funds from EFBC, the shell corporation used by Defendant Catain in the conspiracy to commit money laundering.  Lamb Aff. at 3-4.  The Government's evidence, if accurate, would diminish Joan Catain's claim to the sale proceeds, because "a third party can never have a successful claim under § 863(n)(6)(A) if the property was the proceeds of an offense."  See United States v. Timley, 507 F.3d 1125, 1130 (8th Cir. 2007).  Moreover, the process of tracing all funds used to purchase and improve the property has not yet been finalized, and so Joan Catain's interest, if any, in the sale proceeds from 4550 Enchanted Point cannot be determined at this time.

As to Q Records, Catain Jr.'s testimony and Q Records' Membership Control Agreement suggest that Q Records was owned by Joan Catain and Catain Jr.  However, evidence presented by Receiver Kelley supports his contention that Defendant Catain was the true owner of Q Records and merely named his wife and son as owners to circumvent the distribution agreement Defendant Catain had with his regular record distributor.  Moreover, if it is determined that the music library provided by Defendant Catain to Q Records was purchased with criminal proceeds, the royalties generated from the music library would be forfeitable as property "involved in or

12

traceable to the money-laundering conspiracy." Forfeiture Order ¶ 2.

**4.      Prejudice**

Finally, Joan Catain avers she will suffer harm or prejudice if she is deprived of her property until her asserted property interests are adjudicated in an ancillary proceeding. Requiring Joan Catain to wait until the ancillary forfeiture proceeding to determine her interests in the sale proceeds from 4550 Enchanted Point and in Q Records does not significantly prejudice her, because the assets will remain frozen in the escrow account and Anchor Bank account[7] pending the outcome of an ancillary proceeding, and will be available to her in the event she prevails in such a proceeding.

Turning to the issue of living expenses, Joan Catain has submitted an affidavit stating she has no resources with which to pay her living expenses and health insurance premiums, and that she and her youngest son have moved in with Catain Jr. Second Joan Catain Aff. [Docket No. 1752]. Based on these circumstances and the possibility that Joan Catain may have an ownership interest in some of the assets frozen in the Catain Receivership, the Court will approve monthly payments of $891 to Joan Catain during the pendency of the forfeiture proceedings. The amount represents $250 in health insurance premiums; $207 in transportation costs; $384 for food,

clothing, and other miscellaneous expenses; and $50 for utilities.[8] The Court declines Joan

---

[7] The Court denies Receiver Kelley's request to transfer the funds in the Q Records account at Anchor Bank until the parties' interests in those funds have been determined in an ancillary forfeiture proceeding.

[8] The amount awarded for health insurance premiums is based on Joan Catain's affidavit attesting to her monthly expenses. See Second Joan Catain Aff. at 2. The allowed amounts for food and other miscellaneous expenses are derived from the 2010 IRS National Standards for

Catain's request for a rental allowance because Catain Jr. is required to pay rent for his residence regardless of whether Joan Catain and her youngest son are living with him. If Joan Catain feels compelled to reimburse Catain Jr. for one-half of his monthly rent payments, she may reimburse him with the amounts, if any, she recovers in an ancillary forfeiture proceeding.

The Barker due process test establishes that Joan Catain's due process rights are not violated by the continued restraint of the assets in the Catain Receivership pending the commencement of an ancillary proceeding. Therefore, the Enchanted Point proceeds and the Q Records funds will remain subject to the Catain Receivership until after Joan Catain's third party claims are determined in an ancillary forfeiture proceeding.

### B. Receiver Kelley's Motions to Sell Music Catalogues

Joan Catain's opposition to Receiver Kelley's motions to sell the music catalogues appears to be based on an argument that the sales are not arms-length transactions because Foss, Defendant Catain's former employee, may hold an ownership interest in the entities purchasing the music catalogues. Because Foss provided Receiver Kelley with an affidavit supporting the Q Records motion, and Foss' wife may have provided real estate services to the Catain Receivership, counsel argues the sale may be tainted.

Receiver Kelley has provided supplemental affidavits [Docket Nos. 1759, 1760] regarding the issue of Foss' ownership interest in the entities. This evidence establishes Foss

---

Allowable Living Expenses for one person's share of these expenses in a household of three. See http://www.irs.gov/businesses/small/article/0,,id=104627,00.html (last visited Feb. 10, 2011). The 2010 IRS Local Standards for Transportation were used to determine the amount allowed for transportation. See http://www.irs.gov/businesses/small/article/0,,id=104623,00.html (last visited Feb. 10, 2011). The amount awarded for utilities represents 20% of Catain Jr.'s monthly utility expenses, which is an estimate of Catain Jr.'s increased utility costs due to Joan Catain's residing with him.

has no ownership, economic, or other interest in Sonorous Records, LLC, the entity seeking to purchase the H.O.B. music catalogue. First Molnar Aff. [Docket No. 1759]. Foss co-owns Innovative Multimedia LLC, which in turns owns 51% of Calhoun Entertainment Group ("Calhoun"), the entity purchasing the Tribute Sounds Catalogue. Second Molnar Aff. [Docket No. 1760]. Foss will contribute $10,000 of the $75,000 purchase price for the Tribute Sounds Catalogue. Joan Catain did not respond to the supplemental affidavits.

The Court finds that the sale of the Tribute Sounds Catalogue is an arm's-length transaction. Calhoun has agreed to pay the appraised value for the Tribute Sounds Catalog. Second Kelley Aff. [Docket No. 1617] at 2. Any interest Joan Catain may assert in the sale proceeds from the music catalogues must be litigated in an ancillary forfeiture proceeding.

## IV. CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that:

A. Receiver Kelley's Motions [Docket Nos. 1615, 1623] to sell the Tribute Sounds and H.O.B. music catalogues are **GRANTED**.

    1. Receiver Kelley is authorized to sell the Tribute Sounds catalogue to Calhoun Entertainment Group under the terms provided in Receiver Kelley's affidavit [Docket No. 1617] supporting the Motion to approve the sale.

    2. Receiver Kelley is authorized to sell the H.O.B. catalogue of music to Sonorous Records under the terms provided in Receiver Kelley's affidavit [Docket No. 1625] supporting the Motion to approve the sale.

B. Receiver Kelley's Motion [Docket No. 1619] to release funds from the Q Records

    account at Anchor Bank to the Catain Receivership checking account is **DENIED**. The funds shall remain frozen in Anchor Bank account number XXXXX5897 pending the outcome of an ancillary forfeiture proceeding to determine their ownership.

C.    Joan Catain's Motion [Docket No. 1656] for division of proceeds from the sale of the Catain home or, alternatively, an extension of monthly living expenses is **GRANTED IN PART and DENIED IN PART**.

    1.    The proceeds from the sale of the 4550 Enchanted Point home shall remain in escrow pending the outcome of the forfeiture proceedings against Defendant Catain.

    2.    Receiver Kelley shall pay $891 per month to Joan Catain as living expenses and health insurance premiums during the pendency of the criminal forfeiture proceedings. The amounts paid will be deducted from the value of any property interest Joan Catain recovers in the criminal forfeiture proceedings.

D.    Joan Catain's Motion [Docket No. 1657] requesting an accounting and award of Q Records' funds and the release of Q Records' ownership rights and interests to Joan Catain and Catain Jr. is **DENIED**.

BY THE COURT:

    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: February 10, 2011.